**REVISED January 12, 2016**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-51151

United States Court of Appeals
Fifth Circuit

**FILED**

January 12, 2016

Lyle W. Cayce
Clerk

DR. MARY LOUISE SERAFINE,

Plaintiff–Appellant,

versus

TIM F. BRANAMAN, Chairman,
  Texas State Board of Examiners of Psychologists, in His Official Capacity;

DARREL D. SPINKS, Executive Director,
  Texas State Board of Examiners of Psychologists, in His Official Capacity,

Defendants–Appellees.

Appeal from the United States District Court
for the Western District of Texas

Before JONES, SMITH, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Mary Serafine ran for office and described herself as a "psychologist" on her campaign website. After the Texas State Board of Examiners of Psychologists ordered her to stop using the title of "psychologist" and to desist from offering or providing psychological services, Serafine sued, alleging that the Psychologists' Licensing Act (the "Act"), Sections 501.001 through 501.505 of the Texas Occupational Code, violates the First and Fourteenth Amendments.

No. 14-51151

The district court denied her claims. We affirm in part and reverse in part and remand.

## I.

Serafine ran for the Texas Senate in 2010. On her campaign website, she described herself as an "Austin attorney and psychologist." To appear on the ballot, she also filed a form with the Secretary of State in which she listed her profession as an "attorney and psychologist." Although she does not have a degree in psychology, she completed a four-year post-doctoral fellowship in psychology at Yale, and the dissertation for her Ph.D. in education was published in *Genetic Psychology Monographs*. Serafine was a professor in the psychology departments at Yale University and Vassar College, where she taught a variety of psychology courses. She has studied under leading psychologists and was a member of the American Psychological Association for several years. She is not licensed to practice as a psychologist in Texas, nor could she be, because she does not hold a doctorate from a qualifying program. Before running for office, Serafine taught seminars and provided one-on-one counseling sessions on personal growth and relationships in Austin. She is a lawyer with a degree from Yale Law School.

In September 2010, the Texas State Board of Examiners of Psychologists (the "Board") sent Serafine a letter informing her that she was violating the Act and ordered her to cease using the title "psychologist" on her campaign website (or in any other context) and to refrain from offering or providing "psychological services" in Texas. Two weeks later, the Board sent a follow-up letter telling Serafine she had thirty days to comply or face legal action from the Texas Attorney General. The Board also sought a correction from two Texas newspapers that had identified Serafine as a psychologist. In January 2011,

No. 14-51151

Serafine received a letter from the Attorney General's office threatening prosecution and referencing the Board's complaint and Serafine's use of the title "psychologist" in public records.

Serafine removed the word "psychologist" from her campaign website and requested that the title be deleted from her listing in *Who's Who in America*. She then sued, claiming that the Act infringed her political speech, commercial speech, equal protection rights, and right to earn a living. She also challenged the Act as vague, overbroad, and a prior restraint.

The district court dismissed the equal protection, right-to-earn-a-living, vagueness, and prior-restraint claims and held a bench trial on the remaining claims. After trial, the court rejected the political speech and overbreadth claims, holding that the Act is a legitimate use of the state's police power, which imposed only an incidental effect on Serafine's speech, and that any impermissible applications of the Act are insubstantial in relation to its overall sweep. The court also rejected the commercial-speech claim, reasoning that the Act is reasonably tailored to further the state's interest in protecting the public from the unauthorized practice of psychology. Serafine appeals.

## II.

Serafine contends that Section 501.003(b)(1) ("(b)(1)"), under which "[a] person is engaged in the practice of psychology" if she represents herself "to the public by a title or description of services that includes the word 'psychological,' 'psychologist,' or 'psychology,'" is unconstitutional as applied to speech on her political campaign website. We agree.

## A.

The Board urges that the power to restrict the use of "psychological," "psychologist," or "psychology," is incidental to its ability to license and is

3

permissible under the "professional speech doctrine." "'[T]he States have a compelling interest in the practice of professions within their boundaries, and . . . as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions.'"[1]  Nevertheless, the extent to which a state can use its licensing power to restrict speech is unsettled.

The Supreme Court has never formally endorsed the professional speech doctrine, though some circuits have embraced it based on Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181, 230–33 (1985).[2]  Recently, we also observed that "state regulation of the practice of a profession, even though that regulation may have an incidental impact on speech, does not violate the Constitution."[3]

Assuming that the professional speech doctrine is valid, its application should be limited.  "There is a difference, for First Amendment purposes, between . . . professionals' speech to the public at large versus their direct, personalized speech with clients."[4]  "While a professional may speak on a variety of topics in a variety of contexts, only some of this speech falls under the

---

[1] *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quoting *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975)).

[2] *See Moore-King v. Cty. of Chesterfield,* 708 F.3d 560, 568–70 (4th Cir. 2013) (applying professional speech doctrine); *Pickup v. Brown,* 740 F.3d 1208, 1228–29 (9th Cir.) (same), *cert. denied,* 134 S. Ct. 2871, *and cert. denied,* 134 S. Ct. 2881 (2014); *Locke v. Shore,* 634 F.3d 1185, 1191–92 (11th Cir. 2011) (same).

[3] *Hines v. Alldredge*, 783 F.3d 197, 201 (5th Cir. 2015), *cert. denied*, 2015 U.S. LEXIS 7664 (U.S. Nov. 30, 2015) (No. 14-1543).  *See also Kagan v. City of New Orleans*, 753 F.3d 560, 562 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1403 (2015) (upholding licensing law for tour guides against First Amendment challenge).

[4] *Wollschlaeger v. Governor of Fla.*, No. 12-14009, 2015 U.S. App. LEXIS 21573, at *69 (11th Cir. Dec. 14, 2015) (alteration in original) (quoting *Locke v. Shore,* 634 F.3d 1185, 1191 (11th Cir. 2011)).

category of "professional speech."[5] Indeed, in his concurrence in *Lowe*, Justice White first suggested this distinction between speech by a professional to a client (which may be restricted) and speech by a professional to the general public, which is subject to full First Amendment protection:

> Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech, or of the press."

*Lowe*, 472 U.S. at 232 (White, J., concurring). Thus, assuming *arguendo* that the speech of professionals can be regulated incidentally to a valid licensing scheme, Justice White's concurrence suggests that such restrictions—to avoid running afoul of the First Amendment—are properly confined to occupational-related speech made to individual clients.

Any interest the government can claim in protecting clients from manipulation or exploitation by a psychotherapist fails when the psychotherapist is no longer speaking to the client in her capacity as such.[6] In other words, the professional speech doctrine is properly limited to the actual practice of the profession. "[T]he state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought."[7] Outside the fiduciary relationship between client and therapist,

---

[5] *Id.*

[6] *See Rosemond v. Markham*, No. CV 13-42-GFVT, 2015 WL 5769091, at *6 (E.D. Ky. Sept. 30, 2015) (explaining that without the "professional-client relationship," the "vices" of the professional speech doctrine "outweigh its virtues").

[7] *Lowe*, 472 U.S. at 231 (White, J., concurring) (quoting *Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring)).

No. 14-51151

speech is granted ordinary First Amendment protection. Indeed, "the principle that the government may restrict entry into professions and vocations through licensing schemes has never been extended to encompass the licensing of speech *per se*."[8]

Serafine's speech on her campaign website was far removed from the context of professional speech. She was not providing advice to any particular client but communicating with the voters at large, so the professional speech doctrine is inapplicable. Serafine's campaign statements are entitled to full First Amendment protection.

### B.

The Board also cites cases upholding restrictions on the use of professional titles. States' ability to limit the use of titles and trade names to protect the public from "false, deceptive, and misleading" advertising is well-established.[9] Nevertheless, *Maceluch* and other cases cited by the Board arose in the context of commercial speech where a party was trying to use a professional title or trade name for business purposes.[10]

The Board did not order Serafine to cease and desist because she used the word "psychologist" on a promotional flyer seeking clients, or on official business letterhead, or in a phonebook advertisement. Instead the Board

---

[8] *Id.* at 229–30.

[9] *Maceluch v. Wysong*, 680 F.2d 1062, 1069 (5th Cir. 1982) (per curiam) (affirming on basis of appended district court opinion); *see also Friedman v. Rogers*, 440 U.S. 1, 15 (1979).

[10] *See Maceluch*, 680 F.2d at 1064, 1068–70 (upholding Texas licensing law that prevented doctors of osteopathy from using "M.D." in connection with their medical practice); *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 605–06 (4th Cir. 1988) (upholding statute that prohibited unlicensed accountants from using the title "public accountant" because of the danger of "misleading commercial speech"); *Brandwein v. Cal. Bd. of Osteopathic Exam'rs*, 708 F.2d 1466, 1469–70 (9th Cir. 1983) (upholding restriction preventing doctor of osteopathy from holding himself out as an M.D. because of the danger of false or misleading commercial speech).

No. 14-51151

directed her to cease describing herself as a psychologist on her political campaign website. Yet Seraphine was seeking votes, not clients. Thus, the inclusion of "psychologist" on the website was not commercial speech, and therefore the decisions involving a state's legitimate power to restrict the use of titles in the commercial context are inapplicable.

C.

Serafine's speech on her campaign website was not professional or commercial speech; it was political speech of the highest form—a candidate seeking election to public office. Indeed, "it can hardly be doubted that the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office."[11]    Section 501.003(b)(1) is a content-based restriction on speech—proscribing one's ability to claim to be a psychologist. As applied to Serafine's political speech, (b)(1) is subject to "exacting scrutiny" and must be "narrowly tailored to serve an overriding state interest."[12]

The state claims that its interest in health and safety extends to mental health and thus to psychology. Though protecting mental health may be a compelling interest, the state has not narrowly tailored its laws to further that interest where it regulates outside the context of the actual practice of psychology. Serafine was not practicing psychology by speaking on her political website or filing forms for political office. Although it is not clear whether the Board was aware of Serafine's activities before her candidacy, she had taught

---

[11] *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 15 (1976) (per curiam)).

[12] *Id.  See also United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812–13 (2000) (explaining that content-based restrictions must survive strict scrutiny).

personal-growth seminars and offered one-on-one sessions to seminar partici-pants for many years, yet the Board did not complain until she decided to run for office.  Perhaps the Board is concerned that by hearing Serafine's claim that she is a psychologist, voters will somehow be converted from political supporters to clients.  Yet, if that is so, the way to protect the state's interest in mental health is for the Board to bring an enforcement action against Ser-afine for engaging in the practice of psychology (once she is actually treating such clients), not to suppress her political speech.  Thus, when the Board applied (b)(1) to a statement made on Serafine's campaign website, it stepped far beyond the bounds of narrow tailoring.

Similarly, any interest the Board might claim in preventing the mislead-ing belief that Serafine was licensed by the state as a psychologist is neither compelling nor narrowly tailored.  As the district court recognized, such an interest is strongest in the context of commercial speech,[13] but as discussed above, Serafine was not engaged in that.  In the political context, the remedy for misleading speech is "more speech, not enforced silence."[14]  Indeed, in the midst of "a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent."[15]

Likewise, in *United States v. Alvarez,* 132 S. Ct. 2537, 2551 (2012) (plur-ality opinion), the Court explained that "[t]ruth needs neither handcuffs nor a badge for its vindication."  The Court held that false statements about receiving the Congressional Medal of Honor made by a water-district board

---

[13] *See Friedman v. Rogers,* 440 U.S. 1, 10 (1979) (discussing why commercial speech needs a lesser degree of protection).

[14] *Brown v. Hartlage,* 456 U.S. 45, 61 (1982) (quoting *Whitney v. California,* 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).

[15] *Id.*

member at a public meeting were entitled to First Amendment protection; it struck down the Stolen Valor Act, which criminalized such statements. *Id.* at 2542–43. The plurality specifically noted the public ridicule and swift refutation that immediately followed the false claim. *Id.* at 2549–50.

Indeed, the Court has long held that "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 271–72 (1964) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Thus, the "First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974).

Unlike the plaintiff in *Alvarez*, Serafine did not engage in a bald-faced lie. This case is much closer to *Byrum v. Landreth*, 566 F.3d 442, 447–48 (5th Cir. 2009), in which we noted the "strong argument" that calling oneself an interior designer in contravention of a state law which required a license in order to do so was "neither actually nor potentially misleading." Serafine has taught psychology at the collegiate level and was published in psychological journals. Thus there is again a "strong argument" that calling herself a psychologist on her campaign website was not misleading. Although she may not be able to practice as a psychologist under Texas law, that does not bear on whether she is a psychologist by reputation or training.[16] Therefore, because the state's interest in proscribing misleading speech is limited in the political context, and because the Board's goal of preventing deception can be served by other means—the vigorous public debate and scrutiny that accompany political

---

[16] For example, a lawyer who is not barred in a particular state does not cease to be a lawyer because he is merely prohibited from practicing in that state.

No. 14-51151

campaigns—(b)(1) is unconstitutional as applied to Serafine.[17]

III.

Serafine contends that Section 501.003(b)(1) and (2) are overbroad. We decline to address her overbreadth argument in regard to (b)(1), because that subsection is invalid as applied to her, but we agree with her that Section 501.003(b)(2) ("(b)(2)") is overbroad.

A.

Although litigants are permitted to raise both as-applied and overbreadth challenges in First Amendment cases, "the lawfulness of the particular application of the law should ordinarily be decided first."[18] Generally, we "proceed to an overbreadth issue" only if "it is determined that the statute would be valid as applied."[19] Applying the overbreadth doctrine is "strong medicine"[20]

---

[17] Because we determine that (b)(1) is invalid as applied, we need not further address Serafine's commercial-speech claim. As discussed above, and as Serafine acknowledges, the facts giving rise to this case concern political rather than commercial speech.

[18] *Bd. of Trs. v. Fox*, 492 U.S. 469, 485 (1989). *See also Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 238 (5th Cir. 2012) (explaining that as-applied challenges should be considered before facial challenges).

[19] *Fox*, 492 U.S. at 484–85. *See also United States v. Stevens*, 559 U.S. 460, 484 (2010) (Alito, J., dissenting) (explaining that "overbreadth invalidation need not and generally should not be administered when the statute under attack is unconstitutional as applied to the challenger before the court"); *Massachusetts v. Oakes,* 491 U.S. 576, 582 (1989) ("There was no need for any comment on the overbreadth challenge, as the defendant's conviction could have been—and indeed was—reversed on a narrower and alternative ground, *i.e.*, that the statute was unconstitutional as applied."); *Spence v. Washington*, 418 U.S. 405, 414 n.9 (1974) ("Because we agree with appellant's as-applied argument, we do not reach the more comprehensive overbreadth contention he also advances."); *Street v. New York*, 394 U.S. 576, 580–81 (1969) (finding no need to consider overbreadth arguments because statute was unconstitutional as applied to defendant's speech); *Netherland v. Eubanks*, 302 F. App'x 244, 247 (5th Cir. 2008) (quoting *Fox,* 492 U.S. at 485); *Moore v. City of Kilgore*, 877 F.2d 364, 390 (5th Cir. 1989) (explaining that because we held a fire department rule unconstitutional as applied to plaintiff's speech, there was no need to consider his additional overbreadth argument).

[20] *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

No. 14-51151

and is also "more difficult to resolve than the as-applied [challenge], since it . . . requires consideration of many more applications than those immediately before the court." *Fox*, 492 U.S. at 485. Though "the occasional case requires us to entertain a facial challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants."[21]

Indeed, the few cases in which the Supreme Court found statutes unconstitutional facially and as applied to defendants' conduct were decided under a different strand of facial invalidity that requires "that the statute could never be applied in a valid manner."[22] The more recent expression of the overbreadth doctrine, which we apply here, allows a party to challenge a statute if "a substantial number of its applications are unconstitutional."[23] Under modern overbreadth doctrine, where a statute is invalid as applied, we should "resist the pulls to decide the constitutional issues involved in this case on a broader basis than the record before us imperatively requires." *Street*, 394 U.S. at 581. Indeed, "[g]oing beyond our 'case or controversy' limits spawns advisory opinions that are likely to be ill-informed. *In re Cao*, 619 F.3d 410, 440 (5th Cir. 2010) (Jones, C.J., concurring in part and dissenting in part). Because (b)(1) is invalid as applied to Serafine's political speech, we need not address her claim that it is overbroad.

---

[21] *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (internal citations omitted).

[22] *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796–98 (1984) (discussing *Stromberg v. California*, 283 U.S. 359 (1931), and *Lovell v. Griffin*, 303 U.S. 444 (1938)).

[23] *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 n.6 (2008)); *see also Taxpayers for Vincent*, 466 U.S. at 798–99 (explaining the development of modern overbreadth doctrine); *Moore*, 877 F.2d at 381 (Goldberg, J., dissenting) (discussing various strands of the overbreadth doctrine).

No. 14-51151

B.

Serafine also brings an overbreadth challenge to (b)(2), which prohibits providing "psychological services to individuals, groups, organizations, or the public." Although Serafine appears to have standing to challenge both (b)(1) and (b)(2) as applied to her (the Board ordered her to cease using the title of psychologist and to refrain from providing psychological services), she does not press an as-applied challenge under (b)(2) in this court.[24] Normally, "the principal advantage of the overbreadth doctrine . . . is that it enables [a litigant] to benefit from the statute's unlawful application *to someone else*." *Fox*, 492 U.S. at 483. Yet, *Fox* held that even in the "unusual situation" in which a "plaintiff has *standing* to challenge *all* the applications of the statute he contends are unlawful," the plaintiff may still bring an overbreadth challenge where an as-applied challenge "will fail." *Id.* at 484. By electing not to press an as-applied challenge to (b)(2), Serafine clears the way for us to consider her overbreadth challenge. Not bringing the as-applied challenge before us is similar to the situation in which the as-applied challenge fails or in which there was no possibility for an as-applied challenge at all.

Our conclusion that the Act is unconstitutional as applied to Serafine's speech pertains only to (b)(1), not (b)(2). Thus, the rule that overbreadth challenges should not be addressed if the statute is invalid as applied does not govern our determination of (b)(2). Therefore, notwithstanding our conclusion in regard to (b)(1), we must also consider Serafine's overbreadth challenge to (b)(2) to vindicate her "right not to be bound by an unconstitutional statute." *Nat'l Treasury Employees Union*, 513 U.S. at 477–78.

---

[24] Although, based on the briefing, it was uncertain whether Serafine was bringing an as-applied challenge to (b)(2), at oral argument her lawyer explicitly stated that she is pressing the as-applied challenge only to (b)(1), not (b)(2).

No. 14-51151

C.

Under the First Amendment, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"[25]    Indeed, "[t]he constitutional defect of an overbroad restraint on speech lies in the risk that the wide sweep of the restraint may chill protected expression."[26]  Even though the state may have the power to regulate the professional speech of psychologists incidental to a valid licensing scheme, if that scheme affects the speech of people beyond the purview of the state's interests or power, it is overbroad.

1.

The overbreadth doctrine does not apply to commercial speech.  *See Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 496–97 (1982).  Thus, before proceeding with the overbreadth analysis, we must clarify that providing psychological services under (b)(2) is not commercial speech.  Commercial speech is speech "that *proposes* a commercial transaction," not "speech for profit."  *Fox*, 492 U.S. at 482.  Therefore, merely receiving compensation for psychological services cannot be commercial speech.  Indeed, "[s]ome of our most valued forms of fully protected speech are uttered for a profit."  *Id.*

Nevertheless, (b)(2) does not govern just the providing of "psychological services but also "*offers* to provide psychological services" (emphasis added).  If such offers are made for pecuniary gain, they properly could be classified as

---

[25] *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange,* 552 U.S. at 449 n.6).  *See also Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 755 (5th Cir. 2010) (explaining that the critical question is "whether the enactment reaches a substantial amount of constitutionally protected conduct").

[26] *United States v. Wallington*, 889 F.2d 573, 576 (5th Cir. 1989).  *See also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.").

No. 14-51151

commercial speech, and an overbreadth analysis might appear in error. Yet, in *Fox*, *id.* at 481–82, the Court explained that where a statute applies to both commercial and non-commercial speech, an overbreadth challenge still may be considered with respect to non-commercial speech. Likewise, because (b)(2) covers both commercial and non-commercial speech, we address the overbreadth challenge, but we properly confine our analysis to the providing of psychological services under that subsection or to offers to provide such services made without a commercial purpose (not for pecuniary gain).

2.

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."[27] "Facial challenges to the constitutionality of statutes should be granted 'sparingly and only as a last resort.'"[28]

Under (b)(2), "[a] person is engaged in the practice of psychology" if she "provides or offers to provide psychological services to individuals, groups, organizations, or the public." Serafine contends that the statute must be construed by looking to Section 501.003(a), which defines "psychological services" as "acts or behaviors that are included within the purview of the *practice of psychology*." (Emphasis added.) In turn, Section 501.003(a) must be construed by reference to Section 501.003(c) ("subsection (c)"), according to which "[t]he practice of psychology"

(1) includes providing or offering to provide services to an individual or group, including providing computerized procedures, that include the application of established principles, methods, and procedures of describing, explaining, and ameliorating behavior;

---

[27] *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 763 (5th Cir. 2008) (quoting *United States v. Williams,* 553 U.S. 285, 293 (2008)).

[28] *Id.* at 762 (quoting *Broadrick,* 413 U.S. at 613).

14

No. 14-51151

(2) addresses normal behavior and involves evaluating, preventing, and remediating psychological, emotional, mental, interpersonal, learning, and behavioral disorders of individuals or groups, as well as the psychological disorders that accompany medical problems, organizational structures, stress, and health;

(3) includes:

(A) using projective techniques, neuropsychological testing, counseling, career counseling, psychotherapy, hypnosis for health care purposes, hypnotherapy, and biofeedback; and

(B) evaluating and treating mental or emotional disorders and disabilities by psychological techniques and procedures; and

(4) is based on:

(A) a systematic body of knowledge and principles acquired in an organized program of graduate study; and

(B) the standards of ethics established by the profession.

TEX. OCC. CODE ANN. § 501.003(c) (West 2015). Serafine urges that subsection (c) is overbroad because it covers a significant amount of advice that is given outside the traditional context of the psychotherapist. Thus, by implication, (b)(2) is also overbroad.

3.

The first inquiry is whether the subsections should be read conjunctively as the Board urges or disjunctively as Serafine contends. Thus, for something to be the "practice of psychology," must it meet the requirements of all four subsections or only one? A textual reading supports the Board's position that subsection (c) is conjunctive. Each of the subparts (1) through (4) begins with a verb ("includes," "addresses," or "is"), and subpart (3) ends with "and" that appears before subpart (4). The presence of "and" (as opposed to "or") indicates that subsection (c) should be read as an inclusive list—the practice of psychology requires something from each of the four subparts.[29]

---

[29] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF

No. 14-51151

That conclusion is undermined, however, by the seeming absurdity that would result if subsection (c) were read conjunctively. A person who has not conducted graduate coursework, as required by Section 501.003(c)(4) ("(c)(4)"), but engaged in the other conduct listed in subsection (c)—counseling clients on psychological disorders, offering psychotherapy, or remediating behavioral problems—could not be said to be providing "psychological services" under (b)(2). If that practitioner did not advertise as a "psychologist" or fall within the other subparts of Section 501.003(b) (such as working for an organization that sells psychological services), she would not be engaged in the "practice of psychology" as defined by the Act. Thus, the Board would be powerless to prevent the very individuals the Act appears most concerned about—those without qualifying doctoral degrees—from providing psychological counseling.

Perhaps to avoid that problem, it appears that the Board heretofore has also read subsection (c) disjunctively. At trial, the chairman of the Board, Branaman, testified that it is disjunctive—so if someone were not applying a "body of knowledge" learned in "an organized program of graduate study" under (c)(4), she still could be engaged in the "practice of psychology" if the other requirements of subsection (c) were met.

Nevertheless, regardless of any enforcement problems that the conjunctive reading occasions, we are bound by the statute as the legislature fashioned it. The grammatical structure of subsection (c) is plain, and notably it contrasts with the disjunctive structure of Section 501.003(b), which uses a similar format (beginning each subsection with a verb) but employs "or" rather than "and" before the last subsection. Thus, while in practice the Board might prefer that subsection (c) be read disjunctively, we agree with the Board's position

LEGAL TEXTS 116–119 (2012) (explaining the conjunctive/disjunctive canon).

here on appeal—the straightforward textual reading of subsection (c) is conjunctive. This reading may limit the Board's ability to bring actions against psychologists it considers illegitimate—those who do not base their practice on principles acquired in a graduate program—but it also will constrain the Board's power, as Serafine is seeking.

4.

Serafine's primary basis for an overbreadth challenge is the sweeping language of Section 501.003(c)(1) and (2) ("(c)(1)" and "(c)(2)"). Serafine correctly contends that providing "services to an individual or group . . . that include the application of established principles, methods, and procedures of describing, explaining, and ameliorating behavior" could apply to a number of activities, such as Alcoholics Anonymous (AA), Weight-Watchers, various self-help groups, life-coaches, yoga teachers, political consultants, and golf professionals. *See* Section 501.003(c)(1).

Similarly, (c)(2) also contains sweeping language requiring that the practice of psychology "address[] normal behavior and  involve[] evaluating, preventing, and remediating psychological, emotional, mental, interpersonal, learning, and behavioral disorders." Yet (c)(2) is somewhat narrower than (c)(1), and given that subsection (c) is conjunctive, we do not read the Act as broadly as does Serafine. Political consultants may describe, explain, and ameliorate behavior (under (c)(1)), but they rarely, if ever, evaluate, prevent, or remediate "psychological, emotional, mental, interpersonal, learning, and behavioral disorders" under (c)(2). Nevertheless, (c)(2) could still apply to Alcoholics Anonymous (AA), Weight-Watchers, golf coaches, yoga teachers, life-coaches, and various self-help groups, which do remediate various "psychological, emotional, mental, interpersonal, learning and behavioral disorders."

17

No. 14-51151

The Board reasons that (c)(3) and (c)(4) limit the scope of subsection (c) to exclude such groups. Under subsection (3), the practice of psychology "includes: (A) using . . . counseling . . . and (B) evaluating and treating mental or emotional disorders and disabilities by psychological techniques and procedures." By requiring the evaluation and treatment of "mental or emotional disorders," Section 501.003(c)(3)(B) is in many ways a repeat of (c)(2), except that it requires the use of "psychological techniques and procedures," which appear to be listed in (c)(3)(A). By narrowing the range of disorders from "psychological, emotional, mental, interpersonal, learning and behavioral disorders" to "mental or emotional disorders and disabilities," (3)(B) does further constrain the "practice of psychology," so that a golf coach no longer appears to fall within its ambit. Nevertheless, Weight Watchers, AA, and other self-help groups that provide counseling to participants on emotional problems would still be included in subsection (c).

Section 501.003(c)(4)(A) provides the most significant limitation, given that it requires services based on "a systematic body of knowledge and principles acquired in an organized program of graduate study" as well as a professional code of ethics. But there is no indication that a practitioner needs to have completed a graduate degree if she has taken graduate-level classes. "Graduate" is defined as "of, relating to, or engaged in studies beyond the first or bachelor's degree." *Graduate*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/graduate (last visited Oct. 26, 2015). Thus, anyone who has taken graduate-level psychology, counseling, or fitness classes after completing a bachelor's degree and applied this knowledge to lead an AA group or work at a Weight-Watcher program would be included in the definition in (c)(4).

18

No. 14-51151

It is also possible that *any* classes taken after the completion of an undergraduate degree, regardless of whether at a traditional university, could be within the definition of an "organized program of graduate study." So, by attending a meditation seminar or AA training conference, it is conceivable that someone could be participating in "an organized program of graduate study." As long as an individual who has taken graduate classes also applies a professional standard of ethics (which it is not unusual for organizations such as AA to have), she would be engaging in the practice of psychology under Section 501.003(c). Thus, although (c)(4) does narrow the scope of subsection (c), and by implication (b)(2), the provision still covers a substantial amount of speech that occurs outside the realm of professional psychologists.

Indeed, though subsection (c) certainly includes professional psychologists, it also applies to other professionals and citizens. Besides leaders for AA, Weight-Watchers, or other self-help groups, someone who has taken graduate classes in psychology, fitness, or counseling and has written a marriage-advice column or parenting blog could conceivably be within the ambit of subsection (c). Prosecution in such a circumstance might sound absurd, but in other jurisdictions it has not been merely hypothetical.

Recently, relying on a similar statute,[30] the Kentucky Board of Examiners of Psychology ordered a syndicated newspaper columnist to stop offering

---

[30] The statute in question was Kentucky Revised Statutes Section 319.010, which defined the "practice of psychology" as

rendering to individuals, groups, organizations, or the public any psychological service involving the application of principles, methods, and procedures of understanding, predicting, and influencing behavior, such as the principles pertaining to learning, perception, motivation, thinking, emotions, and interpersonal relationships; the methods and procedures of interviewing, counseling, and psychotherapy; and psychological testing in constructing, administering, and interpreting tests of mental abilities, aptitudes, interests, attitudes, personality characteristics, emotion, and motivation. The application of said principles in testing, evaluation, treatment, use

No. 14-51151

parenting advice in response to readers' questions. *See Rosemond v. Markham*, No. CV 13-42-GFVT, 2015 WL 5769091, at \*1–2 (E.D. Ky. Sept. 30, 2015). The columnist, who held a master's degree in psychology but was not a licensed psychologist, had recommended that the parents of a "highly spoiled under-achiev[ing]" teenager suspend his privileges until he improved his grades. *Id.* at \*1. According to the state, such public advice constituted the "practice of psychology." *Id.* at \*2.

Similarly, at Serafine's trial, the chairman of the Board testified that he could not tell, without more information or looking at a specific case, whether golf coaches, weight-loss services, or smoking-cessation programs would be within the "practice of psychology" as defined in subsection (c). The "opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident."[31]

Like the airport officials in *Jews for Jesus*, who "alone [had] the power to decide in the first instance whether a given activity [wa]s airport related,"[32] here the Board would get to decide in the first instance what advice constitutes the "practice of psychology," then enforce the law as it sees fit. Such unfettered discretion is untenable. Even if the Board had promised to limit the scope of its enforcement, the Supreme Court has held that this is insufficient, and the First Amendment "does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). Like the Court, we "would not

---

of psychotherapeutic techniques, and other methods includes, but is not limited to: diagnosis, prevention, and amelioration of adjustment problems and emotional, mental, nervous, and addictive disorders and mental health conditions of individuals and groups; educational and vocational counseling; the evaluation and planning for effective work and learning situations; and the resolution of interpersonal and social conflicts.

[31] *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (quoting *Lewis v. City of New Orleans,* 415 U.S. 130, 136 (1974) (Powell, J., concurring)).

[32] *Id.*

uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.*

The Board urges that because Section 501.004 of the Texas Occupation Code contains limited exemptions from the Act for clergy members, certain non-profit employees, and various licensed professionals (including physicians, attorneys, registered nurses, licensed social workers, licensed counselors, and licensed therapists), its scope is appropriately narrowed to professional psychologists. Yet if anything, under the canon of *expressio unius*, the presence of those exemptions suggests that anyone not granted an exemption in Section 501.004 is affirmatively covered by the Act.[33] Life coaches, weight loss counselors, and AA sponsors could all fall under the Act as discussed above.

Although the Board maintains that, under *United States v. Wallington*, 889 F.2d 573, 576 (5th Cir. 1989), we should construe the statute narrowly to avoid overbreadth problems, we are mindful of the Supreme Court's decision not to "rely upon" the canon of constitutional avoidance in the overbreadth context.[34] Courts should "impose a limiting construction on a statute only if it is readily susceptible to such a construction." *Stevens*, 559 U.S. at 481 (quoting *Reno v. ACLU,* 521 U.S. 844, 884 (1997)). Nor should we "rewrite a . . . law to conform it to constitutional requirements." *Id.* (alteration in original) (quoting *ACLU*, 521 U.S. at 884–85). The plain text properly limits the sweep of Section 501.003(c) to the evaluation and treatment of mental or emotional disorders, using psychological techniques such as counseling, by someone who relies on

---

[33] *See* SCALIA & GARNER, *supra*, at 108 (explaining that the "more specific the enumeration, the greater the force of the [*expressio unius*] canon").

[34] *Stevens*, 559 U.S. at 481; *see also Hersh*, 553 F.3d at 756–57 (5th Cir. 2008) (quoting *United States v. Albertini,* 472 U.S. 675, 680 (1985)) (recognizing "that the doctrine of constitutional avoidance 'is not a license for the judiciary to rewrite language enacted by the legislature'").

No. 14-51151

post-undergraduate classes or training and follows a professional code of ethics. We decline to give it an additional extra-textual limiting construction in a frantic attempt to rescue it.

The ability to provide guidance about the common problems of life—marriage, children, alcohol, health—is a foundation of human interaction and society, whether this advice be found in an almanac, at the feet of grand-parents, or in a circle of friends. There is no doubt that such speech is protected by the First Amendment.[35] By limiting the ability of individuals to dispense personal advice about mental or emotional problems based on knowledge gleaned in a graduate class in practically any context, subsection (c) chills and prohibits protected speech. But that is precisely what the overbreadth doctrine is meant to prevent. *See Free Speech Coal.*, 535 U.S. at 255. Section 501.003(c), and by implication, Section 501.003(b)(2), are overbroad and contravene the First Amendment.

## IV.

Serafine's prior-restraint challenge fails. There is a "clear distinction, 'solidly grounded in our cases, between prior restraints and subsequent punishments.'" *Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 235 (5th Cir. 2012) (quoting *Alexander v. United States,* 509 U.S. 544, 550 (1993)). Prior restraints "involve 'administrative and judicial orders [such as temporary restraining orders and permanent injunctions] *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Id.* (alteration in original) (quoting *Alexander,* 509 U.S. at 550). Thus, by "penalizing past speech," the Act is not a prior restraint on speech. *Alexander*, 509 U.S.

---

[35] *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)) (stating that government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content").

No. 14-51151

at 553.  The district court was correct in rejecting this claim.

In summary, the judgment is AFFIRMED in regard to the prior-restraint claim and REVERSED in respect to the constitutionality of Section 501.003(b)(1) as applied to Serafine's campaign speech and in regard to the overbreadth of Section 501.003(b)(2).  This matter is REMANDED for entry of appropriate orders and judgment and other proceedings as needed.