RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SUSAN B. ANTHONY LIST; COALITION OPPOSED TO
ADDITIONAL SPENDING & TAXES,

      *Plaintiffs-Appellees*,

   *v.*

STEVEN DRIEHAUS,

      *Defendants*,

OHIO ELECTIONS COMMISSION; JOHN R.
MROCZKOWSKI; BRYAN FELMET; CHARLES E.
CALVERT; JAYME P. SMOOT; HARVEY H. SHAPIRO;
DEGEE WILHELM; LARRY L. WOLPERT; PHILIP
RICHTER,

      *Defendants-Appellants*.

No. 14-4008

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:10-cv-00720; 1:10-cv-00754—Timothy S. Black, District Judge.

Argued: December 10, 2015

Decided and Filed: February 24, 2016

Before:COLE, Chief Judge; SUTTON, Circuit Judge; BELL, District Judge.[*]

---

## COUNSEL

**ARGUED:** Tiffany L. Carwile, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Yaakov M. Roth, JONES DAY, Washington, D.C., for Appellee Susan B. Anthony List. **ON BRIEF:** Tiffany L. Carwile, Bridget C. Coontz, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants. Yaakov M. Roth, Michael A.

---

[*]The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

Carvin, JONES DAY, Washington, D.C., David R. Langdon, LANGDON LAW LLC, West Chester, Ohio, for Appellee Susan B. Anthony List. Curt C. Hartman, THE LAW FIRM OF CURT C. HARTMAN, Cincinnati, Ohio, Christopher P. Finney, FINNEY LAW FIRM LLC, Cincinnati, Ohio, for Appellee Coalition Opposed to Additional Spending. Deborah J. Dewart, Swansboro, North Carolina, Maurice A. Thompson, 1851 CENTER FOR CONSTITUTIONAL LAW, Columbus, Ohio, David J. Carey, THOMPSON HINE LLP, Columbus, Ohio, John K. Bush, BINGHAM GREENEBAUM DOLL LLP, Louisville, Kentucky, John C. Eastman, CENTER FOR CONSTITUTIONAL JURISPRUDENCE, Orange, California, Allen Dickerson, CENTER FOR COMPETITIVE POLITICS, Alexandria, Virginia, for Amici Curiae.

---

**OPINION**

---

COLE, Chief Judge. Susan B. Anthony List ("SBA List") and the Coalition Opposed to Additional Spending and Taxes ("COAST") sued the Ohio Elections Commission ("Commission") and various state officials, alleging that Ohio's political false-statements laws, Ohio Rev. Code § 3517.21(B)(9)−(10), violate the First and Fourteenth Amendments. The district court agreed and entered summary judgment and a permanent injunction in favor of SBA List and COAST. *Susan B. Anthony List v. Ohio Elections Comm'n*, 45 F. Supp. 3d 765, 781 (S.D. Ohio 2014). Because the laws are content-based restrictions that burden core protected political speech and are not narrowly tailored to achieve the state's interest in promoting fair elections, we affirm.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Ohio's Political False-Statements Laws

Ohio's political false-statements laws prohibit persons from disseminating false information about a political candidate in campaign materials during the campaign season "knowing the same to be false or with reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate." Ohio Rev. Code § 3517.21(B)(10). The statutes specifically prohibit false statements about a candidate's voting record, but are not limited to that. *See* Ohio Rev. Code § 3517.21(B)(9)−(10). "Campaign materials" are broadly defined as, but not limited to, "sample ballots, an

advertisement on radio or television or in a newspaper or periodical, a public speech, [or] press release." Ohio Rev. Code § 3517.21(B).

Any person, including the Secretary of State or a Board of Elections official, may file a complaint with the Commission alleging a violation of the political false-statements laws. Ohio Rev. Code §§ 3517.21(C), 3517.153. For a complaint filed shortly before an election, there is a three-step process to be convicted of the crime of making a political false statement. First, a panel of the Commission conducts a preliminary probable cause hearing based on the complaint and issues a public finding. Ohio Rev. Code §§ 3517.154, 3517.156. If the panel finds probable cause, the complaint proceeds to an adjudicatory hearing before the full Commission. Ohio Rev. Code § 3517.156(C)(2) (referencing the hearing procedures outlined by § 3517.155). If, after the adjudicatory hearing, the Commission finds by clear and convincing evidence that a party violated the political false-statements laws, it may refer the case to a prosecutor. Ohio Rev. Code §§ 3517.21(C), 3517.155(A)(1)(c), 3517.155(D). If convicted in subsequent state court proceedings, first-time violators may be sentenced up to six months in prison or fined up to $5,000. Ohio Rev. Code § 3517.992(V). For complaints filed after an election, more than sixty days before a primary election, or more than ninety days before a general election, there is no probable cause hearing and the complaint proceeds directly to an adjudicatory hearing. Ohio Rev. Code § 3517.155.

### B. Litigation

In 2010, then-Congressman Steven Driehaus filed a complaint with the Commission alleging that SBA List violated Ohio's political false-statements laws by issuing a press release accusing him of voting for "taxpayer-funded abortion" by voting for the Affordable Care Act. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2339 (2014). A panel of the Commission issued a probable cause finding that SBA List violated the law. *Id*. SBA List responded by filing suit against Driehaus and various state officials in the Southern District of Ohio. That case was consolidated with a similar case that COAST filed, adding the Commission as a defendant, based on its desire to make similar accusations against Driehaus in a mass email. Both parties sought declaratory and injunctive relief, alleging the political false-statements laws violate the First and Fourteenth Amendments to the United States Constitution. *Id.* at 2339−40.

The Supreme Court held this case was ripe for review as a facial challenge, despite the dismissal of the administrative proceedings. *Id.* at 2347.[1]  On remand, the district court granted SBA List's and COAST's motions for summary judgment, holding that Ohio's political false-statements laws were content-based restrictions that fail strict scrutiny review. *Ohio Elections Comm'n*, 45 F. Supp. 3d at 775−79.  Accordingly, the district court "str[uck] down the laws as unconstitutional and permanently enjoin[ed] the Ohio Elections Commission and its members from enforcing Ohio's political false-statements laws." *Id*. at 770.  The Commission appeals.

## II.    STANDARD OF REVIEW

We review de novo a district court's decision to grant summary judgment. *E.g., Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 242 (6th Cir. 2015).  Summary judgment is only appropriate if the record, when viewed in the light most favorable to the nonmoving party, reveals no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(a).

## III.    ANALYSIS

### A.  Whether We Are Bound By Sixth Circuit Precedent

As an initial matter, the Commission argues we are bound by our decision in *Pestrak v. Ohio Elections Commission*, 926 F.2d 573 (6th Cir. 1991), which held that Ohio's political false-statements laws were constitutional on their face and, for the most part, in their enforcement. "A published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)); *see also* 6th Cir. R. 32.1(b).  Despite the Commission's arguments, we conclude we are no longer bound by *Pestrak* due to intervening Supreme Court decisions.

First, while the 1986 version of the statute construed by *Pestrak* had identical prohibitions, it had different enforcement procedures that alleviate some of the problems with the current statute. *Compare* Ohio Rev. Code § 3599.091 (1986), *with* Ohio Rev. Code §§ 3517.156,

---

[1]Once Driehaus lost the election, he withdrew his complaint with the Commission and from this litigation.

3517.21 (1995). Under the former statute, the Commission did not issue probable cause findings, but waited until its investigation was complete before making any ruling on a complaint. *See* Ohio Rev. Code § 3599.091(C) (1986). Further, while the former statute provided the Commission with subpoena power, the accused party may not have been compelled to defend itself until there was a finding that it had in fact violated the political false-statements laws. *See* Ohio Rev. Code § 3599.091(D) (1986).

Second, several post-*Pestrak* Supreme Court rulings call our decision into question. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 351−53 (1995); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). But the Supreme Court's decision in *United States v. Alvarez*, 132 S. Ct. 2537 (2012), most clearly abrogates *Pestrak*'s reasoning. In *Alvarez*, the Supreme Court struck down the Stolen Valor Act, a law that prohibited persons from falsely claiming they won the Congressional Medal of Honor, regardless of if the false statement was made knowingly.

*Alvarez* abrogates *Pestrak*'s holding that knowing false speech merits no constitutional protection. In *Pestrak*, we determined that, on their face, Ohio's political false-statements laws were constitutional because "false speech, even political speech, does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth." *Pestrak*, 926 F.2d at 577. However, in *Alvarez* the Supreme Court unanimously rejected the "categorical rule . . . that false statements receive no First Amendment protection." *Alvarez*, 132 S. Ct. at 2545 (plurality opinion); *see id.* at 2254−55 (Breyer, J., concurring in the judgment); *id.* at 2563 (Alito, J., dissenting). In particular, *Alvarez* distinguished the cases on which *Pestrak* relied, noting that these cases did not depend on the falsity of the statements, but on the fact that they were defamatory, fraudulent, or caused some other "legally cognizable harm associated with a false statement, such as an invasion of privacy or the costs of vexatious litigation." *Alvarez*, 132 S. Ct. at 2545 (plurality opinion); *see also Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 620 (2003) (upholding a statute prohibiting fraudulent speech, but advising that a "[f]alse statement alone does not subject a [speaker] to fraud liability" unless there is also intent to deceive); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (prohibiting damages for

a defamatory remark concerning a public official unless the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not"); *Garrison v. Louisiana*, 379 U.S. 64, 73 (1964) (same). This undermines *Pestrak*'s fundamental premise that false statements, without more, deserve no constitutional protection.

*Alvarez* further repudiates *Pestrak*'s assumption that the government can selectively regulate false statements on certain topics. It posited that giving governments this power could lead to unwanted consequences and abuses. *Alvarez*, 132 S. Ct. at 2547−48 (plurality opinion) ("Permitting the government to decree this speech to be a criminal offense . . . would endorse government authority to compile a list of subjects about which false statements are punishable. That governmental power has no clear limiting principle."); *id.* at 2553 (Breyer, J., concurring in the judgment) ("[T]he pervasiveness of false statements, made for better or for worse motives, made thoughtlessly or deliberately, made with or without accompanying harm, provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively . . ."). Finally, *Alvarez* confirms that the First Amendment protects the "civic duty" to engage in public debate, with a preference for counteracting lies with more accurate information, rather than by restricting lies. *Id.* at 2550 (plurality opinion); *id.* at 2556 (Breyer, J., concurring in the judgment).

Accordingly, we are not bound by *Pestrak*'s determination that Ohio's political false-statements laws are constitutional and, to the extent today's holding conflicts with *Pestrak,* it has been abrogated by *Alvarez.*

## B. Level of Scrutiny

The first step in a constitutional inquiry is which level of scrutiny applies. In this instance, strict scrutiny applies, whether we apply old First Amendment law or more recent First Amendment law.

### 1. Burdening Core Speech

Under prior jurisprudence, before analyzing whether a speech prohibition was constitutional, courts had to determine whether a challenged restriction burdened core First Amendment speech or non-core speech that warranted less protection. *See, e.g.*, *McIntyre*,

514 U.S. at 347.  Core-protected speech received the highest level of review under strict scrutiny, while speech further from the core received a lower level of review.  *Id.* at 344−47.

Political speech is at the core of First Amendment protections.  *See id.* at 346; *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976); *Sullivan*, 376 U.S. at 269−70.  Though combining protected speech with unprotected speech does not afford the speaker absolute immunity for lies, *see Garrison*, 379 U.S. at 75, "the power to proscribe [speech] on the basis of *one* content element (*e.g.*, obscenity) does not entail the power to proscribe it on the basis of *other* content elements," *R.A.V.*, 505 U.S. at 386.  Even false speech receives some constitutional protection.  *E.g.*, *Alvarez*, 132 S. Ct. at 2545.

On their face, Ohio's political false-statements laws target speech at the core of First Amendment protections—political speech.  Contrary to the Commission's arguments, Ohio's laws reach not only defamatory and fraudulent remarks, but *all* false speech regarding a political candidate, even that which may not be material, negative, defamatory, or libelous.  *Compare* Ohio Rev. Code § 3517.21(B)(9) (prohibiting false statements about a candidate's voting record), *with* § 3517.21(B)(10) (a catchall provision, prohibiting, in general, "a false statement concerning a candidate.").  Accordingly, strict scrutiny is appropriate.

### 2. *Content-Based Prohibitions*

The Supreme Court's 2015 decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218, sought to clarify the level of review due to certain speech prohibitions.  That test focused on whether a law was content-based at all, rather than the type of content the law targeted.  The *Reed* Court held that strict scrutiny is the appropriate level of review when a law governs any "specific subject matter . . . even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230 (citing *Consol. Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980)).  Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226.  Ohio's political false-statements laws only govern speech about political candidates during an election.  Thus, they are content-based restrictions focused on a specific subject matter and are subject to strict scrutiny.

**C. Constitutional Analysis**

Laws subject to strict scrutiny are presumptively unconstitutional and can only survive if they (1) serve a compelling state interest and (2) are narrowly tailored to achieve that interest. *Id.*; *McIntyre*, 514 U.S. at 346−47. "[I]t is the 'rare case in which a speech restriction withstands strict scrutiny.'" *Reed*, 135 S. Ct. at 2236 (Kagan, J., concurring in the judgment) (citation and alterations omitted).

Here, Ohio's interests in preserving the integrity of its elections, protecting "voters from confusion and undue influence," and "ensuring that an individual's right to vote is not undermined by fraud in the election process" are compelling. *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion); *see also McIntyre*, 514 U.S. at 349 (Ohio's interest in preventing fraud and libel "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large."), *id.* at 379 (Scalia, J., dissenting) ("[N]o justification for regulation is more compelling than protection of the electoral process. Other rights, even the most basic, are illusory if the right to vote is undermined." (internal quotation marks and citation omitted)); *Eu v. San Francisco Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989) (noting that a state has a "compelling interest in preserving the integrity of its election process"). But Ohio's laws do not meet the second requirement: being narrowly tailored to protect the integrity of Ohio's elections. Thus, this is not such a "rare case" that survives strict scrutiny.

The Commission argues that Ohio's political false-statements laws should receive the less-exacting intermediate scrutiny. It did not address SBA List's and COAST's argument that the law is subject to strict scrutiny. Therefore, it is not surprising that the Commission's arguments are insufficient to survive strict scrutiny. Ohio's laws do not pass constitutional muster because they are not narrowly tailored in their (1) timing, (2) lack of a screening process for frivolous complaints, (3) application to non-material statements, (4) application to commercial intermediaries, and (5) over-inclusiveness and under-inclusiveness.

First, the timing of Ohio's administrative process does not necessarily promote fair elections. While the laws provide an expedited timeline for complaints filed within a certain

number of days before an election, complaints filed outside this timeframe are free to linger for six months. Ohio Rev. Code §§ 3517.154(A)(2)(a), 3517.155, 3517.156(B)(1). Even when a complaint is expedited, there is no guarantee the administrative or criminal proceedings will conclude before the election or within time for the candidate's campaign to recover from any false information that was disseminated. Indeed, candidates filing complaints against their political opponents count on the fact that "an ultimate decision on the merits will be deferred until after the relevant election." *Driehaus*, 134 S. Ct. at 2346 (quoting Br. of Amicus Curiae Ohio Att'y Gen. Michael DeWine in Supp. of Neither Party (filed U.S. Mar. 3, 2014) (No. 13-193), 2014 WL 880938, at *14−15 ("DeWine Amicus Br.")). A final finding that occurs *after* the election does not preserve the integrity of the election. On the other hand, in many cases, "a preelection probable-cause finding . . . itself may be viewed [by the electorate] as a sanction by the State," *Driehaus*, 134 S. Ct. at 2346 (quoting DeWine Amicus Br., 2014 WL 880938, at *13), that "triggers 'profound' political damage, even before a final [Commission] adjudication," *Ohio Elections Comm'n*, 45 F. Supp. 3d at 772 (quoting DeWine Amicus Br., 2014 WL 880938, at *6). The timing of Ohio's process is not narrowly tailored to promote fair elections.

Second, Ohio fails to screen out frivolous complaints prior to a probable cause hearing. *See* Ohio Rev. Code § 3517.154(A)(1). While this permits a panel of the Commission to review and reach a probable cause conclusion on complaints as quickly as possible, it also provides frivolous complainants an audience and requires purported violators to respond to a potentially frivolous complaint. "Because the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents." *Driehaus*, 134 S. Ct. at 2345; *see also* Ohio Rev. Code §§ 3517.21(C), 3517.153. There is no process for screening out frivolous complaints or complaints that, on their face, only complain of non-actionable statements, such as opinions. *See* Ohio Rev. Code § 3517.154(A)(1). Indeed, some complainants use the law's process "to gain a campaign advantage without ever having to prove the falsity of a statement . . . tim[ing] their submissions to achieve maximum disruption . . . forc[ing political opponents] to divert significant time and resources . . . in the crucial days leading up to an election." *Driehaus*, 134 S. Ct. at 2346 (quoting DeWine Amicus Br., 2014 WL 880938, at *7, *14−15). The potential for attorney's fees and the costs for frivolous complaints does not save the law because

this finding of frivolity does not occur until *after* a probable cause finding or a full adjudicatory hearing. *See* Ohio Rev. Code § 3517.155(E). The process of designating a panel, permitting parties to engage in motion practice, and having a panel conduct a probable cause review for plainly frivolous or non-actionable complaints is not narrowly tailored to preserve fair elections.

Third, Ohio's laws apply to *all* false statements, including non-material statements. *See* Ohio Rev. Code § 3517.21(B)(9)−(10). Though the Commission argues that the political false-statements laws require that the false statement be material, no such requirement exists on the law's face, *see* Ohio Rev. Code § 3517.21(B), nor has either party cited any case in which courts have imputed a materiality requirement to the political false-statements laws. Thus, influencing an election by lying about a political candidate's shoe size or vote on whether to continue a congressional debate is just as actionable as lying about a candidate's party affiliation or vote on an important policy issue, such as the Affordable Care Act. *See* Ohio Rev. Code § 3517.21(B)(10). Further, the law prohibits false statements regarding a political candidate— even outside the political arena—so long as the statement is "designed to promote the election, nomination, or defeat of the candidate," and is made in broadly defined "campaign materials." *See* Ohio Rev. Code § 3517.21(B)(10). Penalizing non-material statements, particularly those made outside the political arena, is not narrowly tailored to preserve fair elections.

Fourth, Ohio's laws apply to anyone who advertises, "post[s], publish[es], circulate[s], distribute[s], or otherwise disseminate[s]" false political speech. *See* Ohio Rev. Code § 3517.21(B)(10). Such a broad prohibition "applies not only to the speaker of the false statement but also to commercial intermediaries like the company that was supposed to erect SBA List's billboard in 2010." *Ohio Elections Comm'n*, 45 F. Supp. 3d at 778. Conducting hearings against or prosecuting a billboard company executive, who was simply the messenger, is not narrowly tailored to preserve fair elections.

Fifth, the law is both over-inclusive and underinclusive. Causing damage to a campaign that ultimately may not be in violation of the law, through a preliminary probable cause ruling, does not preserve the integrity of the elections and in fact undermines the state's interest in promoting fair elections. At the same time, the law may not timely penalize those who violate it, nor does it provide for campaigns that are the victim of potentially damaging false statements.

"[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 135 S. Ct. at 2232 (internal quotation marks and citation omitted). Though Ohio's interests "are assuredly legitimate, we are not persuaded that they justify [such an] extremely broad prohibition." *McIntyre*, 514 U.S. at 351. Indeed, courts have consistently erred on the side of permitting more political speech than less. *See, e.g., Alvarez,* 132 S. Ct. at 2550.

Finally, Ohio's political false-statements laws have similar features to another Ohio election law that the Supreme Court found unconstitutional. In *McIntyre,* the Supreme Court struck down Ohio's election law prohibiting anonymous leafleting because its prohibitions included non-material statements that were "not even arguably false or misleading," made by candidates, campaign supporters, and "individuals acting independently and using only their own modest resources," whether made "on the eve of an election, when the opportunity for reply is limited," or months in advance. *McIntyre*, 514 U.S. at 351−52. Ohio's political false-statements laws have all of the same flaws. Such glaring oversteps are not narrowly tailored to preserve fair elections.

Other courts to evaluate similar laws post-*Alvarez* have reached the same conclusion. *See 281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014) ("[N]o amount of narrow tailoring succeeds because [Minnesota's political false-statements law] is not necessary, is simultaneously overbroad and underinclusive, and is not the least restrictive means of achieving any stated goal."), *cert. denied*, 135 S. Ct. 1550 (2015); *Commonwealth v. Lucas*, 34 N.E.3d 1242, 1257 (Mass. 2015) (striking down Massachusetts' law, which was similar to Ohio's); *see also Rickert v. State Pub. Disclosure Comm'n*, 168 P.3d 826, 829−31 (Wash. 2007) (striking down Washington's political false-statements law, which required proof of actual malice, but not defamatory nature); *c.f. Serafine v. Branaman*, 810 F.3d 354, 361 (5th Cir. 2016) (striking down a Texas law regulating use of the professional title "psychologist" because it was not narrowly tailored to serve the state's compelling interest in protecting mental health "where it regulates outside the context of the actual practice of psychology . . . [to a] political website or filing forms for political office").

## IV.    CONCLUSION

Ohio's political false-statements laws are content-based restrictions targeting core political speech that are not narrowly tailored to serve the state's admittedly compelling interest in conducting fair elections.  Accordingly, we affirm the district court's judgment finding the laws unconstitutional.