**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1853**

ROSS ABBOTT; COLLEGE LIBERTARIANS AT THE UNIVERSITY OF SOUTH CAROLINA; YOUNG AMERICANS FOR LIBERTY AT THE UNIVERSITY OF SOUTH CAROLINA,

Plaintiffs – Appellants,

v.

HARRIS PASTIDES; DENNIS PRUITT; BOBBY GIST; CARL R. WELLS,

Defendants – Appellees.

------------------------------

STUDENTS FOR LIFE OF AMERICA; ACLU OF SOUTH CAROLINA; DKT LIBERTY PROJECT; INDIVIDUAL RIGHTS FOUNDATION; NATIONAL COALITION AGAINST CENSORSHIP; REASON FOUNDATION; STUDENT PRESS LAW CENTER,

Amici Supporting Appellants.

Appeal from the United States District Court for the District of South Carolina, at Columbia. Margaret B. Seymour, Senior District Judge. (3:16-cv-00538-MBS)

Argued: March 22, 2018                    Decided: August 16, 2018

Before MOTZ, DUNCAN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Harris wrote the opinion, in which Judge Motz and Judge Duncan joined.

**ARGUED:** Robert Corn-Revere, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Appellants. Carl Frederick Muller, CARL F. MULLER, ATTORNEY AT LAW, PA, Greenville, South Carolina, for Appellees. **ON BRIEF:** Edward T. Fenno, FENNO LAW FIRM, LLC, Charleston, South Carolina; Ronald G. London, Lisa B. Zycherman, DAVIS WRIGHT TREMAINE LLP, Washington, D.C., for Appellants. William H. Davidson, II, Kenneth P. Woodington, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees. John C. Eastman, Anthony T. Caso, Center for Constitutional Jurisprudence, CHAPMAN UNIVERSITY FOWLER SCHOOL OF LAW, Orange, California, for Amicus Students for Life of America. Ryan W. Marth, Minneapolis, Minnesota, David B. Shemano, ROBINS KAPLAN LLP, Los Angeles, California, for Amici ACLU of South Carolina, DKT Liberty Project, Individual Rights Foundation, National Coalition Against Censorship, Reason Foundation, and Student Press Law Center.

PAMELA HARRIS, Circuit Judge:

In 2015, two student groups at the University of South Carolina sought approval for a "Free Speech Event" to highlight perceived threats to free expression on college campuses. According to the groups, the event they were planning would include visual displays of material that had provoked free-speech controversies at other schools, including a swastika. The University approved, and the Free Speech Event took place on campus without interference.

The event did, however, generate complaints from other students, who objected to the displays and accused its sponsors of making sexist and racist statements at the scene. A University official met with Ross Abbott, one of the event's student sponsors, to review the complaints and determine whether an investigation was warranted. A few weeks later, he notified Abbott that there was no cause for investigation and that the matter had been dropped.

The result was a First Amendment action against the University, filed by Abbott and the two student groups behind the Free Speech Event. According to Abbott and the other plaintiffs, University officials violated their First Amendment rights when they required Abbott to attend a meeting to discuss complaints about their event. The plaintiffs also mounted a facial challenge to the University's general policy on harassment, arguing that it is unconstitutionally vague and overly broad. The district court rejected both claims and entered summary judgment for the University defendants.

We agree with the district court and affirm on both counts. The University neither prevented the plaintiffs from holding their Free Speech Event nor sanctioned them after

3

the fact. Its prompt and minimally intrusive resolution of subsequent student complaints does not rise to the level of a First Amendment violation. And because the plaintiffs cannot show a credible threat that the University will enforce its harassment policy against their speech in the future, they lack standing to pursue their facial attack on the policy.

## I.

## A.

In 2009, the United States Department of Justice ("DOJ") opened an investigation into allegations of racial discrimination at the University of South Carolina ("USC" or "University"). In response, the University hired outside counsel to draft a "Student Non-Discrimination and Non-Harassment Policy." Pursuant to an agreement between the University and DOJ, DOJ reviewed and approved the final language of the new harassment policy, which was formally adopted in 2013 as "STAF 6.24."

In its introduction, STAF 6.24 sets out the University's dual commitments to preventing discrimination and harassment and to upholding "principles of academic freedom" and free expression. J.A. 90. The policy is designed to achieve both those ends by fostering "an academic, social and living environment that is free from discrimination and harassment" and encourages "the open exchange of ideas." *Id.* At the outset, STAF 6.24 clarifies that its strictures will extend only to "behavior and speech that is not constitutionally protected and which limits or denies the rights of students to participate or benefit in the educational program." *Id.*

4

Prohibited harassment is defined by STAF 6.24 as a "specific type of illegal discrimination" consisting of conduct – which may be "written," "oral," or "graphic," as well as "physical" – directed at students because of a protected characteristic such as race, religion, national origin, or sex. J.A. 91. Consistent with STAF 6.24's introduction, the definition of harassment is limited to conduct that is "sufficiently severe, pervasive, or persistent so as to interfere with or limit the ability" of the targeted students to "participate in or benefit from the programs, services, and activities provided by the University." *Id.*; *cf. Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (describing student-on-student sexual harassment actionable under Title IX as "severe, pervasive and objectively offensive" conduct that "undermines and detracts from the victims' educational experience"). Examples of such "harmful conduct" may include "objectionable epithets" and "demeaning depictions or treatment," as well as "threatened or actual abuse or harm." J.A. 91. But STAF 6.24 also expressly excludes from the definition of harassment any use of materials or discussions "for academic purposes appropriate to the academic context." *Id.*

STAF 6.24 goes on to establish a complaint procedure for students. Any student may file a complaint with the University's Office of Equal Opportunity Programs against another student "believed to have violated this policy or otherwise engaged in discriminatory or harassing behavior." J.A. 92. The Office then will designate a staff member to handle the complaint and "ensure that [it] is fairly and expeditiously investigated and if necessary, that appropriate sanctions are assessed." J.A. 93.

5

Anonymous complaints will be handled by interviewing any identified witnesses and alleged offenders. *Id.*

**B.**

This case began when Ross Abbott, on behalf of two student groups – the College Libertarians and Young Americans for Liberty – sought approval to hold a "Free Speech Event" at the University of South Carolina. Abbott, then president of the College Libertarians, met with Kim McMahon, USC's Director of Campus Life, and described an event intended to "draw attention to the various threats to free speech on campuses." J.A. 152. As part of that effort, Abbott explained, the groups planned to "create mock versions of several symbols and speeches that have been censored in the past," including an "Indian good luck symbol that resembles a swastika." J.A. 152. McMahon approved the Free Speech Event (the "Event") as described. In her email to Abbott, McMahon said that she saw "no controversy in educating [the] campus about what is happening in the world," and that she hoped the Event would be "a chance to learn and grow (and even be a bit uncomfortable), not further any intolerance, censorship or acts of incivility." J.A. 151.

The Event proceeded as planned on November 23, 2015, in front of USC's Russell House Union Building, as the sponsoring students had requested. Posters at the Event included one depicting a large red swastika and another featuring the word "wetback" in outsized print. J.A. 69. Abbott and the other students distributed handouts referring to what they viewed as incidents of censorship at USC and on other campuses, and explaining their displays as examples of such incidents. The Event lasted for several

6

hours, during which several complaints from faculty and other USC community members were forwarded to McMahon by email. McMahon's response was to defend the Event: "This is free speech and . . . if they are being respectful and trying to help learn and create dialogue then I am not sure how to help those who are uncomfortable[.]" J.A. 154. McMahon clarified, however, that because she was not at the scene, she could not "provide context" or confirm that the Event was being conducted in the manner she had approved. J.A. 156. The Event concluded without any intervention from University officials.

Almost immediately, the University's Office of Equal Opportunity Programs ("EOP Office") received three written complaints from students about the Event, one of which named Ross Abbott as an "involved part[y]," J.A. 67, and two of which appear to have been submitted anonymously. The complaints objected to the display of "offensive symbols and racial slurs," *id.* – in particular, the swastika and the "wetback" sign. *See* J.A. 67–76. One student also complained about the sponsoring students' behavior on the scene, alleging that they "engag[ed] rudely with USC students" and made "sexist and racist statements" to them. J.A. 72. According to the complaining students, the Event and the associated conduct constituted discrimination or harassment against protected groups.

The next day, on November 24, 2015, Carl Wells, USC's Assistant Director of the EOP Office and Deputy Title IX Coordinator, sent Abbott a letter informing him of the complaints. "Please contact this office," the letter directed, "within the next five (5) working days . . . to arrange an appointment to fully discuss the charges as alleged." J.A.

7

66. If the matter could not be resolved otherwise, Wells told Abbott, then "we shall move to investigate the complaint," culminating with a recommendation to the Provost and President of the University. *Id.* In the meantime, Abbott should not contact the named complainant, or discuss the complaints with any member of the University community. Though the letter purported to attach a "Notice of Charge" in addition to copies of the complaints about the Event, only the complaints were enclosed. Use of the term "Notice of Charge," the University later said, was a clerical error.[1]

Approximately two weeks later, on December 8, 2015, Wells met with Abbott and Michael Kriete, the president of Young Americans for Liberty, to discuss the complaints. Because Abbott recorded the meeting (with Wells's apparent consent), there is no dispute as to what transpired. Wells assured the students that notwithstanding the letter's reference to a "Notice of Charge," nobody had been charged with a violation of STAF 6.24. The meeting, Wells explained, was a standard "practice of the University" in response to complaints, J.A. 177, intended simply to gather information – the "who, what, when, whys, and hows" of the Event. J.A. 158. Indeed, the University had yet to determine whether it even would investigate the incident:

> We are in pre-complaint mode . . . because we don't have enough information right now, we're trying to assess whether or not what was presented to us by members of this community actually rise to a level of something that would be a complaint or whether we're going to do an investigation or not. So, again, we are in pre-investigation mode.

---

[1] The term "Notice of Charge" appears in a different USC policy, "EOP 1.01," concerning harassment complaints against *non*-student University personnel. *See* J.A. 91 n.2; J.A. 81. STAF 6.24, by contrast, which governs complaints against students, makes no reference to a "Notice of Charge."

J.A. 159. Wells reiterated the point on several occasions. Near the end of the meeting, for instance, he told Abbott: "I'm going to emphasize to you again, we are at the point in our exploration to make sure [we] understand what happened here and to decide if this is something we respond to or not. The decision to respond or not respond has not been made. We're just trying to understand." J.A. 181; *see also* J.A. 185 ("the next step is for us to determine whether we will open an investigation or not").

For his part, Abbott explained that the Event was held to raise awareness about campus free-speech issues and emphasized that he had prior authorization for the displays. Abbott also expressed discomfort at being required to attend the meeting, telling Wells: "I . . . do not like that I have to be here for this meeting," and that "the University is not upholding its obligation to respect my free-speech rights by requiring me to be here." J.A. 179, 180. The meeting lasted for approximately 30 to 45 minutes.

On December 23, 2015, approximately one month after the Free Speech Event and two weeks after the meeting, Wells sent Abbott another letter. The EOP Office, Wells informed Abbott, had "found no cause for investigating" the complaints related to the Free Speech Event, and would "not move any further in regard to this matter." J.A. 196.

## C.

Two months later, in February 2016, Abbott, the College Libertarians, and Young Americans for Liberty (together, the "plaintiffs"[2]) filed a § 1983 suit against multiple

---

[2] Although Abbott has since graduated from USC, the parties agree that he retains standing as a plaintiff to pursue retrospective relief in the form of damages under § 1983. (Continued)

9

USC officials, including Carl Wells, alleging violations of their First Amendment rights. In their first, "as-applied" claim, they argued that by "investigating" Abbott in connection with the Free Speech Event, University officials impermissibly chilled their free expression, entitling them to damages. J.A. 30–31. In a second count, the plaintiffs alleged that the University's harassment policy on its face violates the First Amendment because it is overly broad and too vague to be capable of precise definition or application, and sought a permanent injunction restraining its future enforcement.[3]

Both parties moved for summary judgment. With respect to the plaintiffs' as-applied claim, the University defendants, sued for damages in their personal capacity, argued that they had not violated the First Amendment as a matter of law and that qualified immunity protects them from damages liability. And, the defendants contended, the plaintiffs have no standing to pursue their facial challenge to STAF 6.24, which in any event is fully consistent with the First Amendment.

The district court granted summary judgment to the University defendants. *Abbott v. Pastides*, 263 F. Supp. 3d 565 (D.S.C. 2017). The court disposed of the as-applied

And the standing of the College Libertarians and Young Americans for Liberty to seek relief as organizational plaintiffs remains unaffected by Abbott's graduation from college. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005).

[3] Two additional claims presented to the district court no longer are at issue in this case. In their complaint, the plaintiffs also raised First Amendment objections to a University statement of ideals, termed the *Carolinian Creed*, and University policies designating "Free Speech Zones" on campus. After the suit was filed, however, USC revised those policies, and the district court dismissed the challenges as moot. *Abbott v. Pastides*, 263 F. Supp. 3d 565, 580–82 (D.S.C. 2017). The plaintiffs do not challenge that ruling on appeal.

10

challenge on the merits, holding as a matter of law that the University's inquiry into the Free Speech Event did not violate the First Amendment. *Id.* at 578. The First Amendment, the court recognized at the outset, applies with equal force on college campuses as in the wider community. *Id.* at 575 (quoting *Healy v. James*, 408 U.S. 169, 180 (1972)). At the same time, the court continued, First Amendment rights are not absolute, and content-based prohibitions on speech will be upheld where they are necessary to serve a compelling governmental interest and narrowly drawn to achieve that end. *Id.* at 575–76 (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991)).

Against that backdrop, the district court went on to analyze the plaintiffs' claim that University officials violated the First Amendment by requiring Abbott to attend a meeting regarding the Free Speech Event. Because the University had not taken any action against the Event or its sponsors, the first question was whether the plaintiffs' speech had been restricted at all. The court ruled that it had, crediting the plaintiffs' claim that they had experienced a First Amendment injury in the form of "self-censorship," or a "chilling effect" on their speech. *Id.* at 576–77. Once Abbott received Wells's letter, the court reasoned, with its reference to a "Notice of Charge," the plaintiffs reasonably could have feared they were subject to discipline, and self-censored protected speech while awaiting notice regarding the status of the complaints. And that notice did not come until roughly two weeks later, when it became clear at the meeting with Wells that in fact there were no charges against any student, or perhaps until roughly two weeks

11

after that, when Wells notified Abbott by letter that the University would not be conducting an investigation or further pursuing the matter. *Id.* at 577 & n.4.

Nevertheless, the court held, this temporary chill on the plaintiffs' speech did not violate the First Amendment. Applying the strict-scrutiny standard that governs content-based speech restrictions, the court concluded that the University's inquiry into the student complaints was permissible as a "narrowly drawn solution that was necessary to serve USC's compelling interest in protecting students' rights to be free from discrimination." *Id.* at 578. As the court explained:

> USC knew of the content of the Free Speech Event, approved the event, and ultimately determined that the event was an acceptable exercise of Plaintiffs' First Amendment rights. USC never attempted to silence Plaintiffs' speech, sanction Plaintiffs for their speech, or prevent students from engaging in similar speech in the future. Instead, Defendants chose a narrow approach to addressing the rights of all students on campus: those who participated in the event and those who felt discriminated by it.

*Id.*

As to the facial challenge to STAF 6.24, the district court agreed with the University defendants that the plaintiffs lacked standing to seek an injunction against the policy's future enforcement. Plaintiffs seeking prospective relief against ongoing or imminent First Amendment violations, as opposed to damages for past First Amendment injuries, may not rely on prior harms for standing, the court explained. Instead, there must be a non-speculative claim of "future injury," usually in the form of a "credible threat" that the challenged law will be enforced against the putative plaintiffs. *Id.* at 578–79. Here, the court found, the University's resolution of the complaints regarding the Free Speech Event should have satisfied the plaintiffs that no similar events they planned

12

to host would "constitute speech regulated by the harassment policy." *Id.* at 579. Moreover, the court reasoned, the plaintiffs had presented no evidence of actual or threatened use of STAF 6.24 to silence the kind of speech in which they wished to engage, and the policy's own terms – which specifically exclude "academic speech" from its ambit – made it clear that the policy "would not be applied to the speech in which Plaintiffs or similarly situated students intend to participate." *Id.* at 580. Accordingly, the court concluded, the plaintiffs were without standing to mount their facial challenge to STAF 6.24.

This timely appeal followed.

## II.

We begin with the plaintiffs' as-applied challenge to the University inquiry into student complaints about their Event. As the district court recognized, the University defendants[4] are entitled to qualified immunity as to damages liability on this claim unless the plaintiffs can establish both (a) the violation of a constitutional right, and (b) that the right was "clearly established" at the time of the violation. *Abbott*, 263 F. Supp. 3d at 575; *see Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The district court resolved the claim under the first prong of this analysis, holding as a matter of law that there was no

---

[4] In this count of their complaint, the plaintiffs sought damages not only from Wells, but also from his supervisor, Bobby Gist. Before the plaintiffs had the opportunity to develop facts concerning Gist's potential role in the matter, the district court stayed discovery and ruled on the pending summary judgment motions. Accordingly, although the plaintiffs make no specific allegations as to Gist's conduct, we, like the district court, consider the two defendants together.

13

First Amendment violation. *Abbott*, 263 F. Supp. 3d at 578. We review that determination de novo, *see Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 895 (4th Cir. 2016), and we agree.

This is an unusual First Amendment claim. University officials approved the plaintiffs' Free Speech Event, knowing that it would include displays of a swastika and other controversial material; allowed the plaintiffs to hold their Event in the precise campus location they requested; did nothing to interfere with the Event as it transpired; and imposed no sanction on the plaintiffs after the fact, notwithstanding student complaints. *Cf., e.g.*, *Rock for Life-UMBC v. Hrabowski*, 594 F. Supp. 2d 598, 602–03 (D. Md. 2009), *aff'd*, 411 F. App'x 541 (4th Cir. 2010) (describing First Amendment challenge to university denial of preferred location for campus display); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 388–89 (4th Cir. 1993) (sustaining First Amendment challenge to university sanctions on fraternity speech, including suspension of fraternity activities). As a result, the plaintiffs are left to argue that the very fact of a University inquiry into those complaints – and, in particular, the requirement that Abbott meet with Wells to discuss the complaints and the Event – violated their First Amendment rights. *See Abbott*, 263 F. Supp. 3d at 575 (describing plaintiffs' claim).

In support of that claim, the plaintiffs advance two arguments. First, they contend that the inquiry "chilled" their exercise of protected speech rights, because they reasonably feared disciplinary action if they sponsored other events similar to the Free Speech Event. And second, in operating as a speech restriction subject to strict scrutiny,

14

the inquiry violated the First Amendment because it was not the least restrictive means of handling the student complaints. We address those arguments in turn.

**A.**

We start with the plaintiffs' contention that their speech was restricted for First Amendment purposes when the University "chilled" the exercise of their right to host on-campus speech events, entitling them to damages. This, too, is an unusual First Amendment argument. Typically, claims for retrospective damages relief under the First Amendment allege direct prohibitions or limitations on speech; it is claims for prospective relief, such as injunctions, that sometimes rest on the prospect of a future injury in the form of self-censorship or unconstitutionally chilled speech that "fall[s] short of a direct prohibition." *See Laird v. Tatum*, 408 U.S. 1, 11–14 (1972). Here, the plaintiffs are using the concept of constitutional chill differently, to establish a *past* restriction or infringement on protected speech that triggers strict scrutiny under the First Amendment. *See Abbott*, 263 F. Supp. 3d at 577.

We have recognized a similar claim in at least one published opinion. *See Reyes v. City of Lynchburg*, 300 F.3d 449, 453, 455 n.8 (4th Cir. 2002) (adjudicating claim that plaintiff is entitled to damages under § 1983 for a past period during which he alleged his First Amendment rights were chilled); *see also Rock for Life-UMBC*, 411 F. App'x at 549 (same). But we have made clear, as the district court recognized, that such a chilling effect amounts to a cognizable First Amendment injury only if it is "objectively reasonable" – that is, if the challenged government action is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *See Abbott*, 263 F.

15

Supp. 3d at 576 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). And we have indicated that when damages are sought for a prior period of unconstitutional chill, the plaintiff must establish that he was deterred from some specific, intended act of expression. *See Reyes*, 300 F.3d at 455 n.8.

Here, the plaintiffs allege that once Abbott received Wells's November 24 letter about student complaints arising from their Free Speech Event – attaching copies of the complaints, referring to a "Notice of Charge," and instructing Abbott to attend a meeting and to refrain from otherwise discussing the matter – they reasonably believed, as would any student of "ordinary firmness," that they might be subjected to discipline if they engaged in similar speech activities. As a result, they say, they "planned to cancel [an] annual Marijuana Legalization Rally," typically held in April, and otherwise "avoided putting on any public events at USC," or, if they did, "hesita[ted] to engage with students" on the scene. J.A. 562–63, 570. According to the plaintiffs, the period during which they were chilled from fully exercising their First Amendment rights extended from the date of Wells's letter until the day on which they filed this suit, February 23, 2016, at which point they again felt "comfortable" engaging in speech activities similar to the Free Speech Event. J.A. 563.

The district court rejected this claim as to the period of time after Abbott's December 8 meeting with Wells or, at the latest, the December 23 letter informing Abbott that there would be no investigation or further action with respect to the Free Speech Event, finding that any reasonable fear of discipline "should have been assuaged" by then. *Abbott*, 263 F. Supp. 3d at 577 & n.4. We agree. By the time Abbott received

16

Wells's December 23 letter, it had become clear that in fact no student had been charged with a violation of STAF 6.24; that the December 8 meeting was standard practice in response to student complaints, and did not reflect any prior determination by the University that the complaints should be investigated; and, finally, that the University had concluded that the display of a swastika and a "wetback" sign, in the context of the plaintiffs' Free Speech Event, did not warrant an investigation under STAF 6.24, let alone the imposition of sanctions. At that point, a student of "ordinary firmness" would have had no reason to refrain from sponsoring, say, a Marijuana Legalization Rally, or to worry that speaking in favor of capitalism, *see* J.A. 570 (alleging hesitation regarding pro-capitalism rally and speech), might lead to punishment.

The plaintiffs rely for their chilling-effect claim on *Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013), but that case only illustrates how far short they fall in their effort to show a "non-speculative and objectively reasonable chilling effect" sufficient to make out a First Amendment injury. *Id.* at 236. In *Cooksey*, we did indeed find that a state regulatory board had chilled the plaintiff's speech, taking actions that would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 236 (internal quotation marks omitted). But in that case, the board: informed the plaintiff that the speech on his website was "under investigation"; then "instructed" him to make changes to that speech and to refrain from making particular statements; and then, when he did so, told him that it would continue to monitor his speech to ensure that it remained in compliance with regulatory requirements. *Id.* at 231–32. Had this case played out differently – had the University informed Abbott that it had determined that an

17

investigation of the Free Speech Event *was* warranted; and then instructed him *not* to display swastikas or "wetback" signs or other controversial material at future events; and then warned him that it would scrutinize future events to ensure that they conformed to STAF 6.24 – then, we agree, a student of "ordinary firmness" might well be deterred from engaging in similar speech activities. Instead, of course, after hearing from Abbott, the University did the opposite, telling the plaintiffs that it had decided against opening an investigation or taking any further action in connection with the Free Speech Event. Under those circumstances, we do not believe that students of "ordinary firmness" would be deterred from sponsoring similar events.

Whether the plaintiffs experienced a speech restriction in the form of a chilling effect before that process ran its course – that is, during the time after the November 24 letter informing Abbott of the complaints but before the December 23 letter announcing that no investigation would be conducted – is a more difficult question. The district court concluded that the plaintiffs' speech *was* chilled during that initial period, reasoning that "a student of 'ordinary firmness' may have self-censored his future speech while awaiting notice from Wells on the status of the official student complaints." *See Abbott*, 263 F. Supp. 3d at 577.

Like the district court, we do not doubt that a college student reasonably might be alarmed and thus deterred by an official letter from a University authority referring to an attached "Notice of Charge" (even if no such notice actually is attached), raising the prospect of an investigation and ultimate recommendation to the University Provost and President, directing his attendance at a meeting, and prohibiting him from discussing the

18

matter with others. *See id.* But our case law suggests that to recover damages, as plaintiffs seek here, it is not enough to establish that a reasonable person *could* have engaged in self-censorship as a result of the University defendant's actions. Instead, the plaintiffs must show that the defendants actually caused the asserted First Amendment harm – here, by alleging that STAF 6.24 deterred some specific intended act of expression protected by the First Amendment. *See Reyes*, 300 F.3d at 455 n.8 (rejecting claim for damages based on past chill because plaintiff failed to allege that challenged city ordinance deterred him from engaging in any specific intended expression). But as the University defendants point out (and plaintiffs do not dispute), neither the College Libertarians nor Young Americans for Liberty has identified any speech event they had planned or wished to sponsor during the brief time period in question – perhaps because, as the plaintiffs explain, the weeks between November 24 (the initial letter to Abbott) and December 23 (the final letter to Abbott) overlap with the Thanksgiving holiday, final exams, and the start of winter vacation. Accordingly, it does not appear that the plaintiffs can establish a past "chill" sufficient to sustain their damages claim for the pre-December 23 period any more than they can for the period after December 23.[5]

---

[5] Nor, we note, can the plaintiffs premise their damages claim on some other alleged constitutional deprivation – a possibility we left open in *Reyes*. Here, as in *Reyes*, the plaintiffs make no specific allegation that officials acted in bad faith, or that Abbott was deprived of due process protections. *See Reyes v. City of Lynchburg*, 300 F.3d 449, 455–57 & n.8 (4th Cir. 2002). And to the extent the plaintiffs may have sought other forms of relief on their as-applied challenge before the district court, *see Abbott*, 263 F. Supp. 3d at 573 (describing relief sought by plaintiffs on all claims), they were addressed neither by the district court nor by the plaintiffs in their brief before this court, and so we (Continued)

19

**B.**

Even if we were to assume, however, that the University's preliminary inquiry into complaints about the Free Speech Event amounted to a cognizable restriction on the plaintiffs' speech for some brief period of time, there would remain the question whether that restriction violated the First Amendment. And here again, we agree with the district court: Any such restriction survives review under the First Amendment. *See Abbott*, 263 F. Supp. 3d at 577–78.

We emphasize that this question, as framed by the parties, is a narrow one. The parties agree, as did the district court, that to the extent the University's procedure for handling student complaints led to reasonable self-censorship by the plaintiffs, it is subject to strict scrutiny under the First Amendment, and can survive review only if it is "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *See id.* at 577; *see also, e.g.*, *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987).[6] And neither party disputes that the University has a compelling

---

need not consider them here. *See Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 153 nn.4, 6 (4th Cir. 2012) (holding that claims not addressed in brief on appeal are waived).

[6] Strict scrutiny, of course, applies only to content-based policies that regulate speech "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015). Applying that standard to all governmental efforts to address complaints that are based on some form of expressive activity – analyzing, for instance, whether a police officer has used narrowly tailored means in responding to a complaint that a picketer is trespassing on private property – might have implications that extend well beyond this appeal. *Cf. Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963) (holding that "an investigation which intrudes into the area of constitutionally protected rights of speech" is valid so long as (Continued)

interest in maintaining a school environment free from illegal discrimination and harassment. *See Abbott*, 263 F. Supp. 3d at 577 (citing *Sigma Chi Fraternity*, 993 F.2d at 393). The only issue the parties contest, and the only issue we have cause to consider, is whether the University's inquiry into student complaints arising from the Free Speech Event was narrowly tailored to that end.

The gist of the plaintiffs' claim is that the University's response was neither "necessary" nor "narrowly drawn" to serve the identified state interest, because it would have been possible to handle student complaints about the Free Speech Event without burdening or involving the plaintiffs at all. First, the plaintiffs argue, the University could and should have "employ[ed] some means of weeding out" complaints that are frivolous or insubstantial "on their face." Appellants' Br. at 42 (quoting *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 474–75 (6th Cir. 2016)). Of course, the University *did* employ "some means" of screening student complaints: a brief and decidedly non-adversarial meeting with Abbott, followed by a decision to take no further action. And as a practical matter, it simply is not the case that the complaints here could be deemed frivolous "on their face." Students objected not only to the visual displays at the Free Speech Event, but also to allegedly harassing behavior and speech – "sexist and racist statements" – at the scene. J.A. 72. Neither the University's prior approval of the Free Speech Event nor anything in the complaints themselves would have allowed the

there is a "substantial relation" between the information sought and a compelling state interest). Again, we emphasize that given the posture of this case, we have no need to decide the issue.

21

University to dismiss those allegations on their face. As Director of Campus Life McMahon, who approved and defended the Free Speech Event, explained, "As I am not there [at the Event] I can't provide context and [tell] if [the] group is doing what their event said it would." J.A. 156.

The plaintiffs insist that even if there was an "angry exchange" during which student sponsors of the Free Speech Event used "racial or sexual terms," it still would be clear that STAF 6.24 had not been violated, obviating any need for further inquiry. Appellants' Reply Br. at 23 n.21. But the facts matter in a situation like that, and we do not agree that school officials confronted with harassment allegations are required to resolve them in the abstract. Nor does the First Amendment require that they assume no actionable harassment or discrimination without first seeking relevant information. As this court has made clear, universities have obligations not only to protect their students' free expression, but also to protect their students. *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 76–77 (4th Cir. 2016) ("[A] school may . . . be held liable under Title IX . . . for what is effectively an official decision by the school not to remedy student-on-student harassment.") (internal quotation marks and alterations omitted).

The Sixth Circuit's decision in *Susan B. Anthony List*, on which the plaintiffs chiefly rely for their "screening process" claim, is not to the contrary. There, the court held that a state law criminalizing false statements about political candidates violated the First Amendment, in part because a candidate in the middle of a campaign could be subjected to a "full adjudicatory hearing" – a public and adversarial probable cause hearing that might appear to voters as an official sanction – based only on a facially

22

meritless complaint by an opposing candidate, timed to achieve "maximum disruption." 814 F.3d at 474–75. We do not think that Wells's single and decidedly non-adversarial meeting with Abbott can be compared to the full adjudicatory process at issue in *Susan B. Anthony List*. Nor, as we have explained, was it possible to dismiss the complaints here as frivolous on their face. *Cf. id.* (hypothesizing complaint that could be dismissed on its face because it objected only to protected statement of opinion).

The plaintiffs have a second, fallback argument: Even if some further inquiry into the complaints was justified, they contend, the University defendants violated the First Amendment because they used the wrong form of inquiry – or, more specifically, because they made inquiries of the wrong person. According to the plaintiffs, University officials were required to speak first with the complaining students, or perhaps with witnesses as part of an "independent investigation," and only then, if indicated, contact Abbott to hear his side of the story. Appellants' Br. at 43–45. But allowing a student accused of a campus infraction an early chance to respond generally is considered a feature of due process, not a bug. *See Goss v. Lopez*, 419 U.S. 566, 581 (1975) (holding that students are entitled under the Due Process Clause to an opportunity to present their version of events before being suspended). Nor is it obvious that the single and confidential meeting Abbott attended with Wells was any more "restrictive" or burdensome than the independent investigation he suggests in its stead, which would have had University officials out in the community searching for fact witnesses to the verbal harassment alleged in the complaints, with attendant risks to the reputations of Abbott and his fellow event sponsors. And, of course, there are obvious practical

23

difficulties in focusing an inquiry on the complainant as opposed to the alleged perpetrator when, as here, at least some of the complaints are anonymous. Indeed, STAF 6.24 specifically contemplates this problem, making it standard procedure to interview alleged offenders in cases involving anonymous complaints.

It bears repeating that the University here did not seek to advance its end of maintaining a campus environment free of illegal discrimination and harassment through the kinds of broad steps that most commonly lead to First Amendment litigation. As the district court observed, it did nothing to interfere with the plaintiffs' Free Speech Event, featuring the display of a swastika and a "wetback" sign, and it did nothing to sanction that speech after the fact. *Abbott*, 263 F. Supp. 3d at 578; *cf., e.g.*, *Sigma Chi Fraternity*, 993 F.2d at 393 (sustaining First Amendment challenge to sanctions on fraternity "ugly woman contest"). Instead, in the face of student complaints, University officials met with Abbott so that he could give his account of the facts – "the who, what, when, whys, and hows," J.A. 158 – and then credited that account in its entirety, declining to conduct an investigation or take any further action. Under the circumstances, we agree with the district court that this minimally burdensome process was narrowly tailored to the relevant state interest and so survives strict scrutiny. *See Abbott*, 263 F. Supp. 3d at 578.[7]

---

[7] In addition to their main objection to the way in which the University conducted its inquiry – that the University involved them at all – the plaintiffs also fault the University for, *inter alia*, not expediting its process to avoid a two-week waiting period between the meeting and Wells's second letter; including in its initial letter to Abbott instructions not to contact the named complainant or discuss the matter with others on campus; and not "joining in the University of Chicago's Principles of Free Expression." Appellants' Br. at 45–46. At the outset, we note that the question under strict scrutiny is (Continued)

24

## C.

For the reasons laid out above, we agree with the district court that the plaintiffs have failed as a matter of law to establish that the University defendants violated their First Amendment rights in connection with the inquiry into the Free Speech Event. *Abbott*, 263 F. Supp. 3d at 578. We note, however, that even if this were not the case, the defendants would be entitled to summary judgment on qualified immunity grounds.

As the district court explained, government officials like the University defendants are "protected under the doctrine of qualified immunity from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 575 (quoting *Pearson*, 555 U.S. at 231). Unless "existing precedent" has "placed the statutory or constitutional question beyond debate," the defendants may not be held liable. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). And even assuming, *arguendo*, that it were possible to find that the University's response to student complaints arising out of the Free Speech Event transgressed some First Amendment limit, the plaintiffs are unable to identify any precedent – and we have found none – that would put that result "beyond debate."

---

whether the complaint procedures utilized by the University are narrowly drawn to advance the *state* interest, not the *plaintiffs'* interests. And to the extent the University's process imposes certain incidental burdens – for instance, short waiting periods or directions to respect the privacy of complainants – that is not enough to render it insufficiently tailored to the state interest. Strict scrutiny requires procedures that are "narrowly tailored, not . . . perfectly tailored." *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1671 (2015) (internal quotation marks omitted).

25

As we and other courts have recognized, First Amendment parameters may be especially difficult to discern in the school context. *See Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014) (observing that "educators are rarely denied immunity from liability arising out of First-Amendment disputes"); *see also Doninger v. Niehoff*, 642 F.3d 334, 351 (2d Cir. 2011) (school officials entitled to qualified immunity for disciplining student based on off-campus speech); *Mellen v. Bunting*, 327 F.3d 355, 376 (4th Cir. 2003) (college official entitled to qualified immunity for holding "supper prayer" that violated Establishment Clause). And as we have noted, the plaintiffs' claim for damages relief in connection with a speech event that the University approved and for which they were never sanctioned presents some especially novel questions. At a minimum, the University defendants were not on clear notice that their response to student complaints regarding the Free Speech Event violated the First Amendment, and for that reason alone they are entitled to qualified immunity.

## III.

We turn now to the plaintiffs' facial challenge to STAF 6.24. In addition to damages for the University's past response to the Free Speech Event, the plaintiffs also sought an injunction against future enforcement of STAF 6.24, arguing that the University's policy is on its face unconstitutionally broad and impermissibly vague. The use of undefined terms like "objectionable epithets" and "demeaning depictions" as examples of conduct that may amount to harassment, the plaintiffs contend, would allow the University to punish multiple forms of protected First Amendment expression. Nor,

26

according to the plaintiffs, is the policy saved by the caveat that it will apply only to conduct "sufficiently severe, pervasive *or* persistent" to deprive its targets of full and equal access to educational benefits, J.A. 91 (emphasis added), because the Court in *Davis*, in discussing the circumstances under which schools may be held liable for student-on-student harassment, referred to conduct that is so "severe, pervasive, *and* objectively offensive" that it bars equal access, *see* 526 U.S. at 651 (emphasis added). The University defendants, for their part, vigorously defend STAF 6.24 as modeled on the essence of the *Davis* standard as we have described it in our own case law, *see Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc) (holding that plaintiff establishes Title IX claim by showing harassment that is "sufficiently severe or pervasive to create a hostile (or abusive) environment"), and further narrowed by express exceptions for speech in "academic" contexts, J.A. 91, or otherwise protected under the First Amendment.

The district court did not reach the merits of this dispute, finding instead that the plaintiffs lacked standing to pursue prospective injunctive relief because they could establish no ongoing or future injury. We review that finding de novo, *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018), and affirm.[8]

---

[8] Although the district court clearly resolved the plaintiffs' facial challenge on standing grounds, *see Abbott*, 263 F. Supp. 3d at 580, its only announced disposition was the grant of summary judgment to the University defendants, *see* J.A. 596. Ordinarily, of course, a lack of subject-matter jurisdiction will lead to dismissal under Rule 12(b)(1), rather than summary judgment under Rule 56(c), which suggests a decision on the merits. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995); 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 & n.33 (3d ed. 2018) (collecting (Continued)

As the district court explained, a plaintiff seeking prospective injunctive relief "may not rely on prior harm" to establish Article III standing. *Abbott*, 263 F. Supp. 3d at 578. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Because the plaintiffs are pursuing prospective injunctive relief in connection with their facial challenge to STAF 6.24, they may not rest on the University's past conduct, but must instead "establish an ongoing or future injury in fact." *Kenny*, 885 F.3d at 287.

We have recognized two ways in which litigants may establish the requisite ongoing injury when seeking to enjoin government policies alleged to violate the First Amendment. *See id.* at 288; *Cooksey*, 721 F.3d at 235–38. First, they may show that they intend to engage in conduct at least arguably protected by the First Amendment but also proscribed by the policy they wish to challenge, and that there is a "credible threat" that the policy will be enforced against them when they do so. *Kenny*, 885 F.3d at 288; *see Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342–45 (2014). Second, they

---

cases). Here, it seems clear from the context that the district court intended to enter summary judgment only as to the claims over which it retained jurisdiction, having dispensed already with the facial challenge on standing grounds. And the parties, for their part, have offered no indication on appeal that they disagree. Accordingly, we treat the district court's entry of summary judgment for defendants on the facial challenge as a dismissal under Rule 12(b)(1) for want of jurisdiction, and affirm on that basis. *Cf. Mexiport, Inc. v. Frontier Commc'ns Servs., Inc.*, 253 F.3d 573, 574 n.2 (11th Cir. 2001) ("Because we are not bound by the label placed on the district court's disposition of the case, we [may] treat the district court's summary judgment ruling as a dismissal [under Rule 12(b)(1)].").

may refrain from exposing themselves to sanctions under the policy, instead making a "sufficient showing of 'self-censorship'" – establishing, that is, a "chilling effect" on their free expression that is "objectively reasonable." *Cooksey*, 721 F.3d at 235–36 (quoting *Benham*, 635 F.3d at 135). Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and "self-censoring" instead. *See Rock for Life-UMBC*, 594 F. Supp. 2d at 606; *Ramirez v. Sanchez Ramos*, 438 F.3d 92, 98 (1st Cir. 2006).

## A.

The most obvious way to demonstrate a credible threat of enforcement in the future, of course, is an enforcement action in the past. *See, e.g.*, *Susan B. Anthony List*, 134 S. Ct. at 2345 ("history of past enforcement" is "good evidence" of a genuine threat of enforcement); *O'Shea*, 414 U.S. at 496 ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."). Our recent decision in *Kenny v. Wilson* is a good example. There, a group of South Carolina students sought to challenge two state laws criminalizing school disturbances and disorderly conduct, seeking an injunction against the laws' enforcement on vagueness grounds. We held that several of the students could show a "credible threat of future enforcement" of the laws against them – primarily because they had previously been arrested and criminally charged under the very same statutes. 885 F.3d at 288–89; *see also Doe v. Univ. of Mich.*, 721 F. Supp. 852, 861 (E.D. Mich. 1989) (holding that students sufficiently

29

alleged credible threat of enforcement of campus speech policy against them where university previously had enforced policy against classroom comments).

The plaintiffs here, by contrast, can point to no evidence of prior sanctions under STAF 6.24 – against them or anyone else – for the type of speech in which they wish to engage. Instead, they argue that the University's inquiry into the Free Speech Event establishes the necessary "credible threat" of enforcement, making it reasonable to expect that they will be sanctioned under STAF 6.24 if they sponsor similar events in the future. Like the district court, we must disagree.

As we have explained already, once Abbott attended his meeting with Wells regarding the Free Speech Event and then received written notice that neither investigation nor sanction was forthcoming, a student of "ordinary firmness" no longer could have reason to fear discipline under STAF 6.24 for similar activity. *See Abbott*, 263 F. Supp. 3d at 577 & n.4. For much the same reason, the plaintiffs cannot establish a "credible threat" that the University would employ STAF 6.24 to sanction, say, their Marijuana Legalization Rally. It is true, as the plaintiffs argue, that Wells's letter announcing that no action would be taken in response to the Free Speech Event did not go on to specify that no action would be taken in response to similar events in the future. But it is up to the plaintiffs to show some objective reason to believe the University would change its position, and this they have not done. As the district court explained, University officials, after concluding their inquiry into the Free Speech Event, did nothing to threaten the plaintiffs with future discipline under STAF 6.24. *Id.* at 580; *cf. Cooksey*, 721 F.3d at 237 (finding objectively reasonable self-censorship in light of

30

"explicit warning" from state "that it will continue to monitor the plaintiff's speech in the future"). And the fact that the University inquired into and then dismissed student complaints arising from the Event – including complaints of verbal harassment at the scene – does not by itself translate into a credible threat that the University would sanction the plaintiffs for engaging in protected speech in the future simply because others found it offensive. *Cf. Ramirez*, 438 F.3d at 99 ("It is simply too much of a stretch to posit that the government's decision to prosecute a Riot Act charge" arising from a protest march also "indicates a willingness to prosecute entirely peaceful First Amendment expression.").

For their claim to the contrary, the plaintiffs rely primarily on *Doe v. University of Michigan*, in which a district court found a credible threat that a campus harassment policy would be enforced against a student's intended classroom speech, conferring standing to seek an injunction. 721 F. Supp. at 858–61. In that case, the court relied on a combination of "legislative history" making plain the university's intent to bar any expression that "many individuals" would find "offensive," official university guidance suggesting that precisely the ideas the student wished to discuss – specifically, differences between the sexes – would be sanctionable if aired in a classroom, and a past record of enforcement of the policy against classroom comments. *Id.* at 859–61. Here, by contrast, on the plaintiffs' own account, the University has made manifest its intent to *allow* speech even when it might or does cause offense, first approving the display of a swastika on campus (though recognizing that it might be a "bit uncomfortable," J.A. 151), and then deciding against disciplinary action in response to student complaints of

31

"offensive symbols" and "offensive signs," J.A. 67, 72.  Moreover, as the district court pointed out, the record in this case is devoid of any evidence that there has "been frequent actual or threatened use of STAF 6.24 to silence the types of speech" in which the plaintiffs wish to engage, and STAF 6.24 specifically "clarifies that the policy does not regulate academic speech." *Abbott*, 263 F. Supp. 3d at 580.  There are significant differences, in short, between this case and *Doe*, and overlooking them here would do a disservice to the good-faith efforts of university officials to mind the details, crafting harassment policies so that they protect the "open exchange of ideas," J.A. 90.[9]

**B.**

Again, the plaintiffs have a fallback argument.  Even if they do not face a credible threat of actual discipline or sanctions under STAF 6.24, they contend, there still is a credible threat of another meeting like the one Abbott was required to attend with Wells.

---

[9] We have recognized a "presumption" of a credible threat of enforcement with respect to "non-moribund" statutes that "facially restrict[] expressive activity by the class to which the plaintiff belongs." *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (internal quotation marks omitted).  The plaintiffs do not rely on that presumption here, and we agree that it does not apply.  There is no question that the plaintiffs belong to the "class" governed by STAF 6.24.  But unlike in *Bartlett*, where the policy "appear[ed] by its terms to apply" to the plaintiffs' anticipated speech and contained no "rule exempting" their intended "issue advocacy," *id.* at 710–11, STAF 6.24 is on its face limited to conduct "sufficiently severe, pervasive or persistent" to deprive its targets of equal educational opportunity, and contains multiple statements exempting the kind of academic speech in which the plaintiffs intend to engage. *See, e.g.*, J.A. 91 ("Harassment does not include the use of materials by students or discussions involving students . . . for academic purposes appropriate to the academic context."); J.A. 90 ("Nothing in this policy is intended to impede the exercise of those rights protected under the First Amendment of the U.S. Constitution.").  Whether or not STAF 6.24 would survive a facial challenge based primarily on the alleged vagueness of its terms – a question we lack jurisdiction to decide – we think these provisos are enough to bring it outside the "presumption" of enforcement discussed in cases like *Bartlett*.

In other words, if they engage in speech events similar to the Free Speech Event, and those events again draw student complaints, then they have reason to expect more meetings with University officials – and those meetings, the plaintiffs claim, are their own form of threatened punishment, sufficiently "chilling" to generate reasonable self-censorship and thus confer standing for their facial challenge. We disagree.

We may accept, at least for purposes of argument, the plaintiffs' premise: that there are some forms of "pre-enforcement" investigation that are so onerous that they become the functional equivalent of "enforcement" for standing purposes. The Supreme Court addressed this question without quite deciding it in *Susan B. Anthony List*, considering whether certain advocacy organizations had standing to seek an injunction on First Amendment grounds against a state law (discussed above) that criminalized false statements made against political candidates. In finding a "credible threat of enforcement" sufficient to confer standing, the Court recognized that the state's administrative process for investigating complaints itself imposed a "substantial" burden virtually indistinguishable from a sanction:

> [T]he practical effect of the [state] scheme is to permit a private complainant to gain a campaign advantage without ever having to prove the falsity of a statement. Complainants may time their submissions to achieve maximum disruption of their political opponents . . . . [T]he target of a false statement complaint may be forced to divert significant time and resources to hire legal counsel and respond to discovery requests in the crucial days leading up to an election. And where, as here, a Commission panel issues a preelection probable-cause finding, such a determination itself may be viewed by the electorate as a sanction by the State.

134 S. Ct. at 2346 (citations, alterations, and internal quotation marks omitted). But there was no need, the Court held, to decide whether the threat of administrative proceedings

33

alone was tantamount to a threat of "enforcement" for standing purposes, because in that case, there also existed a realistic threat of criminal prosecution. *Id.*

What is clear, however, is that a threatened administrative inquiry will not be treated as an ongoing First Amendment injury sufficient to confer standing unless the administrative process itself imposes some significant burden, independent of any ultimate sanction. *See id.* (describing burdens imposed by administrative process as of "particular concern" because of their potential to influence election results regardless of outcome); *Rock for Life-UMBC*, 594 F. Supp. 2d at 608 (collecting cases). A "significantly intrusive" FBI field investigation into a plaintiff's political beliefs and personal life, for instance, has been deemed sufficiently onerous that it reasonably could generate a "chilling effect" for standing purposes, *Clark v. Library of Congress*, 750 F.2d 89, 92–95 (D.C. Cir. 1984), as has an "extraordinarily intrusive and chilling" investigation by a federal agency, lasting for eight months, into certain plaintiffs' protected speech and beliefs, *White v. Lee*, 227 F.3d 1214, 1228, 1237–38, 1242 (9th Cir. 2000).

The single, non-intrusive meeting that plaintiffs rely on here, followed two weeks later by an announcement that no further action would be taken, does not fall within this category. Even an objectively reasonable "threat" that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of "enforcement" or as the kind of "extraordinarily intrusive" process that might make self-censorship an objectively reasonable response.

And because the plaintiffs can point to no reason to think they will be subjected to some different and more onerous process not yet experienced or threatened, their claim to injury by way of threatened "process" is purely speculative and thus insufficient to establish standing. *See Benham*, 635 F.3d at 135 ("Subjective or speculative accounts of . . . a chilling effect . . . are not sufficient. Any chilling effect must be objectively reasonable.") (alterations and internal quotation marks omitted).[10]

## IV.

Freedom of speech needs "breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963). And "vigilant protection" of First Amendment rights is "nowhere more vital" than at public universities, which are "peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). For those reasons, we have recognized that policies that formally or informally suppress protected expression at public universities raise serious First Amendment concerns. *See Sigma Chi Fraternity*, 993 F.2d at 393. And while we are mindful of universities' obligations to address serious discrimination and harassment against their students, we

---

[10] In addition, we note a mismatch between the plaintiffs' facial challenge to STAF 6.24, limited to certain substantive provisions of that policy, and a theory of standing that rests on a threatened meeting or other administrative process, governed by a different section of STAF 6.24 devoted to complaint procedures. Though we give "broad latitude" to facial challenges in the First Amendment context, a plaintiff still "must establish that he has standing to challenge *each* provision of [a policy] by showing that he was injured by application of *those provisions*." *Covenant Media of S.C., LLC v. City of N. Charleston*, 439 F.3d 421, 429–30 (4th Cir. 2007) (emphases added). Even if the threat of a meeting under STAF 6.24's complaint procedures could rise to the level of a cognizable First Amendment injury-in-fact, it would not automatically "provide [the plaintiffs] a passport to explore the constitutionality" of the rest of STAF 6.24's provisions. *Id.* at 429.

also are attentive to the dangers of stretching policies beyond their purpose to stifle debate, enforce dogma, or punish dissent.

Here, however, we have a University that approved and encouraged a speech event intended to be controversial, with the knowledge that it would cause "[d]iscomfort." J.A. 156. And in the face of student complaints, the University made no effort to sanction that speech after the fact. The plaintiffs suggest that a ruling against them will make it impossible for any student to mount a successful challenge to an overly broad campus harassment policy, but we must disagree. Our decision today is limited to the facts before us, and the courthouse door remains open to the claims of students who experience cognizable restrictions on their right to free expression.

*AFFIRMED*